**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 1 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

KENNETH EUGENE TURRENTINE,

Petitioner-Appellant,

v.

MIKE MULLIN, Warden,

Respondent-Appellee.

No. 03-5028

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA
## (D.C. No. 99-CV-055-K(M))

---

Stephen J. Greubel, Tulsa, Oklahoma, for Petitioner-Appellant.

Robert L. Whittaker, Assistant Attorney General, Criminal Division (W.A. Drew Edmondson, Attorney General of Oklahoma, with him on the brief), for Respondent-Appellee.

---

Before **LUCERO**, **McCONNELL,** and **TYMKOVICH,** Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Currently on death row in the State of Oklahoma, Petitioner Kenneth E. Turrentine ("Mr. Turrentine" or "Petitioner") appeals the final order of the United States District Court for the Northern District of Oklahoma, which denied him a writ of habeas corpus on his petition filed pursuant to 28 U.S.C. § 2254. Mr. Turrentine was convicted in the Oklahoma courts on four counts of first degree murder. On three of those counts, he was sentenced to death; on the remaining count, he was sentenced to life in prison without the possibility of parole. He is currently an inmate of the Oklahoma State Penitentiary under the custody of Warden Mike Mullin. For the reasons set forth below, we reverse in part and affirm in part the decision of the district court.

## Background

The facts as found by the state court are, pursuant to 28 U.S.C. § 2254(e)(1), presumed correct. We recite them as adopted by the Oklahoma Court of Criminal Appeals, although we present additional facts throughout this opinion as they become pertinent to our analysis. *See generally Turrentine v. State of Oklahoma*, 965 P.2d 955 (Okla. Crim. App. 1998) ("*Turrentine I*").

The facts of this case are both sad and horrific. On June 4, 1994, Mr. Turrentine killed his sister Avon Stevenson, his estranged girlfriend Anita Richardson, and Ms. Richardson's two children, thirteen year old Martise Richardson ("Martise") and twenty-two year old Tina Pennington, sometimes

-2-

referred to in the briefs and record as Tina Richardson ("Tina"). *See Turrentine I,* 965 P.2d at 963. For three months leading up to the deadly events of that June, Mr. Turrentine and Ms. Richardson had been experiencing such problems in their relationship that Mr. Turrentine had moved out of the home they once shared. (T. Tr. 531.) Mr. Turrentine moved in with his sister Ms. Stevenson. *Id.*

While separated from Ms. Richardson and living with his sister, Mr. Turrentine began to believe that Ms. Richardson was having an affair with two other men, and that his sister, Ms. Stevenson, knew of these affairs because she was apparently a friend and confidant of Ms. Richardson's. (T. Tr. 532); *see also Turrentine I*, 965 P.2d at 963. Whether true or not, he also came to believe that Ms. Richardson and Ms. Stevenson were cheating him out of money, to support their drug habits. (T. Tr. 532-33); *see also Turrentine I*, 965 P.2d at 963.

On June 3, 1994, the day before the murders, Mr. Turrentine telephoned his ex-wife, Catherine Turrentine, and told her that he was at Ms. Richardson's house and that things were "about to come to a head." (T. Tr. 562). That same day, he asked his ex-wife to return to him a .22 caliber pistol, but she refused. (T. Tr. 561); *see also Turrentine I*, 965 P.2d at 963. He returned to make the same request the next morning, June 4, 1994, and this time his ex-wife gave Mr. Turrentine the loaded pistol. (T. Tr. 562-63); *see also Turrentine I*, 965 P.2d at 963.

Later in the day on June 4, 1994, Mr. Turrentine confronted his sister about Ms. Richardson's supposed affairs, and an argument ensued. (T. Tr. 532); *see also Turrentine I*, 965 P.2d at 963. Ms. Stevenson apparently laughed in Mr. Turrentine's face during this argument and called him a "punk." (T. Tr. 532); *see also Turrentine I*, 965 P.2d at 963. In response, Mr. Turrentine placed the .22 caliber pistol to Ms. Stevenson's head and fired; she died at the scene. (T. Tr. 532); *see also Turrentine I*, 965 P.2d at 964.

Mr. Turrentine then drove to Ms. Richardson's house, where the two began to argue. (T. Tr. 532); *see also Turrentine I*, 965 P.2d at 963. As they argued, they moved from the front to the back bedroom of the house and, after more argument and struggle, Mr. Turrentine shot Ms. Richardson in the head. She died at the scene. (Tr. 532); *see also Turrentine I*, 965 P.2d at 963. He subsequently shot both Martise and Tina in the head, and they died at the scene as well. *Id.*

After this carnage, Mr. Turrentine talked to a 911 operator and declared that he had shot his "ol lady," his kids, and his sister. (State's Ex. No. 17); *see also Turrentine I*, 965 P.2d at 964. When officers arrived at the scene, they immediately took Mr. Turrentine into custody and advised him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Mr. Turrentine waived his rights and told the officers that he had shot his sister, his estranged girlfriend, and his girlfriend's two children. (T. Tr. 531-33); *see also Turrentine I*, 965 P.2d at 964.

A medical examiner later confirmed that Ms. Stevenson, Ms. Richardson, Martise, and Tina had all died from gunshot wounds to the head.

Mr. Turrentine was tried before a jury in Tulsa County District Court and was convicted of four counts of first degree murder for the killings of Ms. Richardson (count one), Martise (count two), Tina (count three), and Ms. Stevenson (count four). At the penalty phase of the trial, the jury found that three aggravating circumstances existed beyond a reasonable doubt as to counts one, two, and three: 1) that the murders were especially heinous, atrocious, or cruel; 2) that Mr. Turrentine knowingly created a great risk of death to more than one person; and 3) that there existed a probability that Mr. Turrentine would constitute a continuing threat to society. As a result, the jury returned sentences of death for each of the first three counts. As to count four, the jury found two aggravating circumstances beyond a reasonable doubt and returned a verdict of life without the possibility of parole.

The Oklahoma Court of Criminal Appeals ("OCCA") affirmed all four of Mr. Turrentine's convictions and sentences. *Turrentine I*, 965 P.2d 955. The United States Supreme Court denied Mr. Turrentine's petition for writ of certiorari on December 14, 1998, *Turrentine v. Oklahoma*, 525 U.S. 1057 (1998), and the OCCA denied post-conviction relief on July 17, 1998. *Turrentine v. State*, 965 P.2d 985 (Okla. Crim. App. 1998) ("*Turrentine II*"). Mr. Turrentine

-5-

then filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the District Court for the Northern District of Oklahoma on August 23, 1999. App. Doc 20.

The district court ruled on Mr. Turrentine's petition on January 21, 2003. The court granted the petition in part, but only as to the application of an aggravating circumstance to the charge of murder in count two. Because the district court found that striking this aggravator would not alter the punishment of death, it denied habeas relief on both the convictions and the sentences. Dist. Ct. Op. at 88. Mr. Turrentine filed a notice of appeal on January 31, 2003. The district court granted a certificate of appealability on eight grounds: 1) an improper jury instruction regarding the doctrine of transferred intent; 2) an improper instruction on second degree murder; 3) an improper instruction regarding a heinous, atrocious, or cruel aggravating circumstance; 4) the sufficiency of the evidence to support a finding of the "heinous, atrocious, or cruel" aggravating circumstance; 5) the sufficiency of the evidence to support a finding of the "great risk of death to more than one person" aggravating circumstance; 6) the trial court's improper admission of victim impact evidence; 7) the trial court's refusal to allow expert opinion for purposes of mitigation; and 8) a claim that the mitigating evidence outweighed the aggravating evidence. We granted a certificate of appealability on two additional grounds: 9) alleged

ineffective assistance of trial counsel; and 10) alleged ineffective assistance of appellate counsel. We consider each of these issues in turn.

## Discussion

### I. Standard of Review

If a claim was adjudicated on the merits in state court, we review the state court ruling under the deferential standard of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, a petitioner is entitled to federal habeas relief only if he can establish that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2); *see also Hale v. Gibson*, 227 F.3d 1298, 1309 (10th Cir. 2000). In conducting this inquiry, we presume the factual findings of the state trial and appellate courts are correct, and we place on the petitioner the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Darks v. Mullin*, 327 F.3d 1001, 1007 (10th Cir. 2003). We review de novo the district court's legal analysis of the state court decision. *Valdez v. Ward*, 219 F.3d 1222, 1230 (10th Cir. 2000).

In applying 28 U.S.C. § 2254(d), we first ask whether the principle of

federal law invoked by the petitioner was clearly established by the Supreme Court at the time of the state court judgment. *Id.* at 1229. If so, we ask whether the state court decision was contrary to or involved an unreasonable application of that clearly established federal law. *Id.* A decision is "contrary to" federal law "if the state court applied a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court decision involves an "unreasonable application" of federal law "if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.*

Finally, even if the state court adjudication was contrary to or involved an unreasonable application of clearly established federal law, our inquiry is not complete. Unless the error is a "structural defect[] in the constitution of the trial mechanism, which def[ies] analysis by harmless-error standards," *Brecht v. Adamson*, 507 U.S. 619, 629 (1993), we must apply the harmless error standard of *Brecht* and *O'Neal v. McAninch*, 513 U.S. 432 (1995). *See Herrera v. Lemaster*, 301 F.3d 1192, 1200 (10th Cir. 2002). Under *Brecht*, habeas relief is not proper unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 623. *O'Neal* addresses the situation where the

court is in "grave doubt" about the likely effect of the error on the jury's verdict—that is, where "the matter is so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error." 513 U.S. at 435. In such a case, *O'Neal* instructs the Court to treat the error "as if it had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Brecht*, 507 U.S. at 623).

On issues where the state court has not previously heard a habeas claim on the merits, the framework of § 2254 does not apply. Instead, we review the district court's legal conclusions de novo and its factual findings for clear error. *Mitchell v. Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001). If the district court's factual findings depend entirely on the state court record, we independently review that record. *Walker v. Gibson*, 228 F.3d 1217, 1225 (10th Cir. 2000), *cert. denied*, 533 U.S. 933 (2001).

II. Issues for Review

    A. First Stage Jury Instruction Issues

        1) Due Process Violation Due to Improper Instruction on Transferred Intent (Counts II – Martise Richardson – and III – Tina Richardson)

Mr. Turrentine first argues that his right to due process under the Fourteenth Amendment to the United States Constitution was violated because the trial court improperly instructed the jury on the doctrine of transferred intent

in its instructions on first degree murder.  This alleged error pertains to Mr. Turrentine's convictions on counts two and three of his indictment for the murders of Martise and Tina.  *See* O.R. Vol. II, at 342-43.

The jury instructions issued by the Oklahoma trial court provided that in order to convict Mr. Turrentine of first degree murder, the jury must find that "the death was caused with malice aforethought."  Inst. No. 19, O.R. Vol. III 464.  The court then instructed the jury that it could find "malice aforethought" in cases of transferred intent—that is, where the defendant had "a deliberate intent to take away the life of a human being *or any other person*." Inst. 20, O.R. Vol. III 465 (emphasis added).  Apparently through carelessness, this instruction omitted three words: the jury instructions should have referred to "a deliberate intention to take away the life of a human being, *either the deceased* or some other person."  OUJI-CR-428 (First Edition).  Omission of the words "either the deceased" rendered the instruction incoherent, implying that there exist "other person[s]" who are not comprehended within the category of "human beings" but who may nonetheless be victims of first degree murder.  Mr. Turrentine argues that this instruction constitutes double error: first, because the trial court altered the instruction so that the jury was given an instruction with no basis in law; second, because the court never should have instructed the jury on transferred intent in the first place, as that doctrine was not applicable to the facts of his

-10-

case.  We regard such sloppiness in the preparation of jury instructions, which apparently passed unnoticed by prosecution, defense, and trial court, disgraceful, especially in a capital case, where scrupulous exactitude can make the difference between life and death.  But the question now is whether the error was harmless.

On direct appeal, the OCCA agreed with Mr. Turrentine that the doctrine of transferred intent was not applicable to his case but found the error harmless. *Turrentine I*, 965 P.2d at 967.  Specifically, it found that because the weight of the evidence "supported the findings of first degree malice aforethought murder," "[a]ny error in instructing the jury on the law of transferred intent was harmless." *Id.*  Thus, "[Mr. Turrentine] has failed to show any prejudice." *Id.*

In so concluding, the OCCA applied the wrong harmless error standard. The proper harmless error standard is that of *Chapman v. California*, 386 U.S. 18, 24 (1967), under which "the beneficiary of a constitutional error [must] prove beyond a reasonable doubt that the error complained of [was harmless]."  The OCCA's harmless error analysis, on the other hand, placed on the petitioner the burden of demonstrating prejudice. *Turrentine I*, 965 P.2d at 967 ("Appellant has failed to show any prejudice.").  This decision, therefore, was contrary to clearly established federal law. *Bell*, 535 U.S. at 694 (habeas court "may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases").

That the OCCA decision was contrary to clearly established federal law, however, is not a sufficient basis for granting habeas relief. We still must conduct our own harmless error analysis under *Brecht*, asking whether the underlying error in the trial court had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 623. In other words, when a state court fails to apply the proper harmless error standard under *Chapman* (whether the error was harmless "beyond a reasonable doubt"), the reviewing federal court must evaluate the trial court error under the *Brecht* standard (whether the error had a "substantial and injurious effect or influence in determining the jury's verdict"). *See Hale*, 227 F.3d at 1324-25.

Furthermore, the Supreme Court has offered specific guidance on the issue of incorrect jury instructions. In *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991), the Court noted that "the fact that [a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief." Instead, the appropriate question on habeas review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72; *see also Hale*, 227 F.3d at 1324. In making this determination, the court must view the instruction "in the context of the instructions as a whole and the trial record." *Id.* Thus, our inquiry is not only whether the error had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S.

-12-

at 623, but also "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *McGuire*, 502 U.S. at 72.

The district court applied the harmless error analysis of *Brecht* and denied habeas relief on counts two and three. After reviewing the evidence presented on the issue of intent, the court found, under reasoning similar to the OCCA's, that ample evidence supported the conclusion that Mr. Turrentine intended to kill his victims. Therefore, the court concluded, the incorrect instruction "did not substantially influence the outcome of the trial, and certainly did not 'so infect the entire trial' that the resulting convictions . . . violated [Mr. Turrentine's] due process rights." Dist. Ct. Op. 21, *citing McGuire*, 502 U.S. at 71.

We agree. In spite of any confusion that might have been caused by the instruction, the instruction does require the element of a deliberate intent to take away the life of a human being. In addition to Mr. Turrentine's own confession, which the jury heard on the 911 tape, they also heard the testimony of three officers who were with Mr. Turrentine at the scene immediately after the murders, and who testified that Mr. Turrentine confessed to killing Martise and Tina. (Tr. Tr. Vol. III, 534; Vol. VI, 1016; Vol. IV, 613.) The jury also heard from a medical expert who testified that both of these victims died of a close range gunshot wound to the head, thus negating a possible factual finding that

-13-

Mr. Turrentine was attempting to kill someone else with each of his shots. (*Id.* Vol. IV 696-707, 725.) Indeed, the most probable effect of the defective instruction was to eliminate an alternate ground for conviction—transferred intent—from the jury's consideration by rendering it unintelligible. That could only help, not hurt, the defendant—though on the facts of this case, as the district court held, it almost certainly had no effect at all. Thus, when viewed in the context of all of the instructions and the entire trial record, we cannot find that Instruction 20 had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623; nor did the instruction result in a violation of Mr. Turrentine's due process rights. *McGuire*, 502 U.S. at 72. The district court was therefore correct to deny habeas relief on this issue.

2) <u>Improper Instruction on Second Degree Murder</u> (Counts II – Martise Richardson – and III – Tina Pennington)

More serious is Mr. Turrentine's argument that the Oklahoma trial court violated his Fourteenth Amendment right to due process when it improperly instructed the jury on second degree murder for counts two and three. Mr. Turrentine requested and was granted an instruction on second degree murder. As explained below, the trial court gave an incorrect instruction—indeed, an instruction that meant the opposite of what it should have said. Defense counsel did not object to the erroneous instruction. (T. Tr., Vol. V. at 900-01.) On review, the state appellate court addressed the issue on the merits and found the

-14-

alleged error harmless, *Turrentine I*, 965 P.2d at 967-68, as did the district court.

Dist. Ct. Op. 25.

The jury instruction in question, No. 23, reads:

> A person may *not* be convicted of MURDER IN THE SECOND DEGREE if he/she engages in conduct imminently dangerous to another person that shows a depraved mind in extreme disregard of human life, although the conduct is not done with the intention of taking the life of or harming any particular individual.

(emphasis added). The italicized word "not" should not have been included. Mr. Turrentine argues that the mistaken inclusion of the word "not" negated the instruction and thus deprived him of his right to be considered for a lesser included offense. In effect, he argues, Jury Instruction No. 23 actually commanded the jury to find him guilty of first degree murder or to acquit.

The OCCA agreed that the instruction on second degree murder was in error, but found it harmless. The OCCA concluded:

> In this case, the jury was instructed to consider the second degree murder instructions only if it found a reasonable doubt as to the defendant's guilt of first degree murder. It is well established that juries are presumed to follow their instructions. As the jury found Appellant guilty of first degree murder in all counts, they did not need to consider the charge of second degree murder and the accompanying instructions. Therefore, any error in those second degree murder instructions was harmless as it did not have a substantial influence on the outcome of the trial.

*Turrentine I*, 965 P.2d at 968 (citations omitted). The district court reviewed this claim de novo because the OCCA again failed to apply the *Chapman* standard;

-15-

but, applying *Brecht*, the district court again denied relief. The district court reasoned, as did the OCCA, that because the jury found Mr. Turrentine guilty of first degree murder on all counts, it did not need to reach the issue of second degree murder, and that therefore the error was harmless.

Because the OCCA applied a harmless error standard different from that of *Chapman*, we must consider whether the ailing instruction had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623. We are also mindful that our review must consider the ailing instruction "in the context of the instructions as a whole and the trial record" when deciding whether the instruction so infected the trial that Mr. Turrentine's conviction violates due process. *McGuire*, 502 U.S. at 72. Instruction No. 22, which preceded the erroneous second degree murder instruction, reads: "*If* you have a reasonable doubt of the defendants' [sic] guilt on the charge of MURDER IN THE FIRST DEGREE, you must *then* consider the charge of SECOND DEGREE MURDER." (emphasis added). It may stand to reason that the erroneous instruction, No. 23, is harmless because there was no indication that the jury would have had any reason to move beyond Instruction 22 to No. 23. However, a reading of the ailing instruction in the context of the proceedings as a whole might also suggest that the jury, after reading all of the instructions, would have concluded that it could not find Mr. Turrentine guilty of second degree murder

-16-

even if it found that all of the elements of that offense were present in his case. Mr. Turrentine had, after all, introduced evidence to the effect that he murdered Martise and Tina in the heat of the moment, and that his capacity was diminished at the time of the murders due to his consumption of a combination of anti-depressant medication, anti-anxiety medication, and a large measure of alcohol—including at least a half bottle of vodka. Juries are presumed to follow their instructions. *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993); *United States v. Carter*, 973 F.2d 1509, 1513 (10th Cir. 1992). In this case, if the jury followed Instruction 23, it would conclude that the defendant could "not" be convicted of second degree murder even if all the legal prerequisites for such a conviction were present. This is the equivalent of instructing the jury that no second degree murder alternative was available—that it was first degree murder or nothing.

The approach to this issue taken by the district court and the OCCA is inconsistent with the logic of the Supreme Court cases requiring a lesser offense instruction in cases where the facts so warrant. As the Court has explained:

> True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some

-17-

offense, the jury is likely to resolve its doubts in favor of conviction.

*Keeble v. United States*, 412 U.S. 205, 212-13 (1973); *see also United States v. Chanthadara*, 230 F.3d 1237, 1257 (10th Cir. 2000), *citing Beck v. Alabama*, 447 U.S. 625, 635 (1980) ("In the federal courts, it has long been beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.") (internal quotation omitted). This is especially true when a defendant faces a capital sentence. As the Court stated in *Beck*:

> [W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.
>
>     Such a risk cannot be tolerated in a case in which the defendant's life is at stake. As we have often stated, there is a significant constitutional difference between the death penalty and lesser punishments:
>
>> "[D]eath is a different kind of punishment from any other which may be imposed in this country . . . . From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 357-58 . . . (opinion of STEVENS, J.).
>
> To insure that the death penalty is indeed imposed on the basis of "reason rather than caprice or emotion," we have invalidated

procedural rules that tended to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination. Thus, if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, [the States are] constitutionally prohibited from withdrawing that option from the jury in a capital case.

447 U.S. at 637-38 (footnotes omitted). *Beck* thus holds that those facing capital punishment are entitled to have the jury instructed on a lesser included offense when the evidence so warrants. The second degree murder instruction was warranted in this case because, as noted above, Mr. Turrentine presented substantial evidence of his own diminished capacity at the time of the murders. Inclusion of the word "not" in the instruction for second degree murder, however, deprived Mr. Turrentine of the benefit of this instruction, just as surely as if the motion for a lesser offense instruction had been denied. Under *Beck*, this necessarily had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623; and we conclude that it "so infected the entire trial that the resulting conviction violates due process." *McGuire*, 502 U.S. at 72.[1]

---

[1]Although we rejected a similar *Beck* claim in *Willingham v. Mullin*, 296 F.3d 917 (10th Cir. 2002), there, the State of Oklahoma argued that, under Oklahoma law, second degree murder was not a lesser included offense of first degree murder and therefore *Beck* was inapplicable. *See Hopkins v. Reeves*, 524 U.S. 88 (1998) (*Beck* is not violated when a state court refuses to instruct on an offense that, under state law, is not a lesser included offense of first degree murder.). The State of Oklahoma has made no such argument here; any argument

(continued...)

It should not be necessary for this Court to point out the seriousness of accurate jury instructions, especially in capital cases. When a man is on trial for his life, dependent on a jury of his peers, it is not too much to ask that prosecution, defense counsel, and most importantly, trial court be alert to errors that could impede the jury in doing its duty. The mistake in this case, inclusion of the word "not," which turned the intended instruction into its opposite, was undoubtedly inadvertent. Apparently, no one even noticed it at trial. But we cannot presume, for purposes of harmless error review, that the jury *disregarded* its instructions. Our system is based on the opposite presumption. If, as the Supreme Court held in *Beck*, a defendant is entitled to a lesser offense instruction, he is entitled to one without the distorting word "not." The error here is sufficiently plain and sufficiently egregious to necessitate habeas relief even though it went unnoticed at trial and was held harmless on state court review. We therefore reverse the district court's decision on this challenge and grant Mr. Turrentine's petition for writ of habeas corpus on counts two and three. Our ruling on this issue, however, does not disturb Mr. Turrentine's capital sentence for count one.

---

[1](...continued)
it might have had on this basis has therefore been waived. *Abercrombie v. City of Catoosa, Okl.*, 896 F.2d 1228, 1231 (10th Cir. 1990) (failure to argue issue in appellate brief or at oral argument constitutes waiver).

B.    Second Stage Trial Issues Regarding Aggravating Factors

Mr. Turrentine next challenges allegedly improper jury instructions at the penalty phase of his trial.  He also argues that the evidence at trial was insufficient to support two of the three aggravating circumstances that formed the basis of his capital sentences.  Because we have already granted a writ of habeas corpus on counts two and three, these charges of error are relevant only to Mr. Turrentine's remaining capital sentence for count one (Ms. Richardson).  Mr. Turrentine presented these claims to both the OCCA and the district court and was denied relief.

Before the imposition of a death sentence in Oklahoma, the sentencing court must find beyond a reasonable doubt the existence of at least one statutorily defined aggravating factor, and then must further determine that the applicable aggravating factors outweigh any mitigating circumstances.  *See* Okla. Stat. tit. 21, § 701.11.  At the penalty phase of Mr. Turrentine's proceedings, the prosecution attempted to prove three aggravating circumstances in an effort to secure a death sentence on each of the four murder verdicts.  The alleged aggravating circumstances were these: 1) that the murders of the victims were especially heinous, atrocious, or cruel; 2) that Mr. Turrentine knowingly created a great risk of death to more than one person; and 3) that there existed a probability that Mr. Turrentine would commit acts of violence constituting a

continuing threat to society.  *See* T. Tr., Vol. VI 960-61.  In response, Mr.

Turrentine presented mitigating evidence, seeking to avoid a sentence of death.

Nevertheless, the jury found the existence of all three aggravating circumstances

beyond a reasonable doubt for the first three murder counts, recommending a

sentence of death for each count.  (T. Tr. Vol. VII 1247-50.)  On count four, the

jury found the existence of two aggravating circumstances and recommended a

sentence of life without the possibility of parole.  The Oklahoma trial court

sentenced Mr. Turrentine according to these recommendations.

Mr. Turrentine argues that because the trial court omitted relevant

language from the instruction on the "heinous, atrocious, or cruel" aggravating

circumstance, the instruction was constitutionally deficient.  He also argues that

the evidence failed to support the jury's finding of this aggravating factor and

the factor that he knowingly created a great risk of death to more than one

person.

1)   <u>Improper Jury Instruction on the "Especially Heinous,</u>
     <u>Atrocious, or Cruel" Aggravating Circumstance</u>   (Count I –
     Ms. Richardson)

Mr. Turrentine argues that the trial court violated his Eighth and

Fourteenth Amendment rights when it omitted the word "physical" from the last

sentence of the jury instruction on the "heinous, atrocious, or cruel" aggravating

circumstance.  As presented to the jury, Instruction No. 35 stated the following:

> As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.
>
> The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or *serious abuse*.

(O.R. Vol. III at 430) (emphasis added). Under Oklahoma law, the word "physical" should have appeared between the words "serious" and "abuse" in the last sentence of the second paragraph of the instruction. *See Turrentine I*, 965 P.2d at 975. Omission of the word "physical" was an error of state law. Disturbing though it may be that prosecution, defense counsel, and trial court all overlooked yet another error in the jury instructions—for an astonishing total of three such errors—a federal court under § 2254 may not grant relief unless there was an error of federal law, in other words, unless this error amounted to a violation of the federal constitution. Mr. Turrentine argues that this instruction, as given, failed to sufficiently narrow the discretion of the sentencer and was therefore unconstitutionally vague.

In order to comply with the dictates of the Eighth Amendment, an aggravating factor must "minimiz[e] the risk of wholly arbitrary and capricious action" by "channeling and limiting . . . the sentencer's discretion in imposing the death penalty." *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988); *Romano*

-23-

*v. Gibson*, 239 F.3d 1156, 1175 (10th Cir. 2001). "It must provide a principled means by which a sentencer can distinguish between those murders warranting a death sentence and those that do not." *Romano*, 239 F.3d at 1175 (citing *Maynard*, 486 U.S. at 363).

Both the OCCA and the district court concluded that the jury instruction at issue satisfied this constitutional standard, and that any error in the omission of the word "physical" was harmless. The OCCA held the error harmless because it found that "[t]he term 'serious abuse' controls the standard of proof, and that term was given to the jury." *See Turrentine I*, 965 P.2d at 975. Furthermore, the court noted, the evidence at trial focused more on the torture aspect of the aggravating factor than the physical abuse aspect. Thus, the error was harmless because it "did not lessen the standard of proof and . . . could have had no impact on the sentencing decision." *Id.* The district court denied relief for essentially the same reasons, although it noted that the OCCA did not directly cite federal law and, out of an abundance of caution, applied the harmless error standard of *Brecht*. Dist. Ct. Op. 31-33.

We, too, apply the harmless error standard of *Brecht*—asking whether the error had a substantial and injurious effect or influence in determining the jury's verdict—because the OCCA again conducted a harmless error analysis different from that set forth by the Supreme Court in *Chapman*. Our inquiry is simpler,

-24-

however, because this Court has already addressed this precise issue. In *Miller v. Mullin*, 354 F.3d 1288, 1299-1300 (10th Cir. 2004), we held that the phrase "serious abuse," without an additional modifier requiring that it be "physical," "still performed its required narrowing function and imposed restraint upon the sentencer." Moreover, in this case, given that Ms. Richardson struggled enough to call 911, and that Mr. Turrentine told Ms. Richardson that he was going to kill her children before he murdered her, there was ample evidence on the basis of which a factfinder could conclude that the "torture" element was present, even without considering whether there was "serious abuse," physical or otherwise. We therefore cannot conclude that the ailing instruction had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623, or that the instruction "so infected the entire trial that the resulting conviction violates due process." *McGuire*, 502 U.S. at 72. Habeas relief on this issue is accordingly denied.

### 2) Insufficient Evidence on Aggravating Circumstance Regarding "Especially Heinous, Atrocious, or Cruel" Conduct

Mr. Turrentine claims that there was insufficient evidence at trial to support a finding of the "especially heinous, atrocious, or cruel" aggravating circumstance. At trial, the jury found the aggravator applicable to the first three murder counts—Ms. Richardson and her two children, Martise and Tina. Again, because we have already granted habeas relief as to counts two and three, we

consider this issue only as it applies to the murder of Ms. Richardson, the basis of count one.

When reviewing the sufficiency of the evidence on a habeas corpus petition, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard reflects our system's longstanding principle that it is the jury's province to weigh the evidence and to draw reasonable inferences from testimony presented at trial. *Id.* Our review under this standard is "'sharply limited[,]' and a court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996), *quoting Wright v. West*, 505 U.S. 277, 296-97 (1992).

Because the Oklahoma courts rejected Mr. Turrentine's claim on the merits, we again look to AEDPA for the appropriate degree of deference to the state court decision. This Court has not yet settled whether a challenge to the sufficiency of the evidence on a habeas petition is a question of fact or a question of law, and therefore whether 28 U.S.C. § 2254(d)(1) or § 2254(d)(2)

applies. *See Moore v. Gibson*, 195 F.3d 1152, 1176-77 (10th Cir. 1999) (surveying a split in the case law); *Torres v. Mullin*, 317 F.3d 1145, 1151 (10th Cir. 2003) (noting that the issue remains unsettled). Section 2254(d)(1) governs questions of law and requires us to determine whether the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Section 2254(d)(2) applies to questions of fact and asks whether the state court decision was "based on an unreasonable determination of the facts in light of the evidence presented." Once again, however, "we need not decide this question here because [Mr. Turrentine] is not entitled to habeas relief under either standard." *Dockins v. Hines*, 374 F.3d 935, 939 (10th Cir. 2004).

When applying the Supreme Court's standard in *Jackson*, we look to Oklahoma law to determine the substantive elements of the "heinous, atrocious, or cruel" aggravating circumstance. *Valdez v. Bravo*, 373 F.3d 1093, 1097 (10th Cir. 2004). As noted above, under Oklahoma law this aggravating factor "requires proof that the death was preceded by torture or serious physical abuse." *Turrentine I*, 965 P.2d at 976. The OCCA has determined that the "torture" element of this aggravating factor "may take any of several forms":

> Torture may include the infliction of either great physical anguish or extreme mental cruelty. . . . [It] must be the result of intentional acts by the defendant . . . [and] must produce mental anguish in addition to that which of necessity accompanies the underlying killing. Analysis must focus on the acts of the defendant toward the victim and the level of tension created. The length of time which the victim

-27-

suffers mental anguish is irrelevant.

*Berget v. State*, 824 P.2d 364, 373 (Okla. Crim. App. 1991). The OCCA has also stated that there are no "specific, uniform criteria, applicable to all murder cases, which would make the application of the 'heinous, atrocious or cruel' aggravator a mechanical procedure." *Robinson v. State*, 900 P.2d 389, 401 (Okla. Crim. App. 1995). "Rather, the examination of the facts of each and every case is necessary in determining whether the aggravator was proved." *Id.* This rule necessarily makes the determination a case by case inquiry. *See id.*

The OCCA found sufficient evidence in Mr. Turrentine's case to support the "heinous, atrocious or cruel" aggravator. The court focused on the "torture aspect" of the aggravator, noting that it "may include the infliction of either great physical anguish or extreme mental cruelty." *Turrentine I*, 965 P.2d at 976. It then concluded that

> [Mr. Turrentine's] own statements provide the basis for a finding of this aggravator as it pertains to Count I (Anita Richardson). [His] statements indicate that he shot Anita first, then Martise and lastly Tina. [He] stated an argument with Anita ensued at the front door, they worked their way to the rear bedroom, where they struggled and [he] told her she and her children were going to die. He then shot her once in the head. . . . [W]e find Appellant's conduct and threats sufficient to cause in Anita the extreme mental anguish necessary to support the mental torture aspect of this aggravator.

*Turrentine I*, 965 P.2d at 976. The district court denied habeas relief for essentially the same reasons.

-28-

Our own review of the evidence confirms the conclusions of the OCCA and the district court. Before the jury were facts of a struggle and a direct statement by Mr. Turrentine that, prior to shooting Ms. Richardson in the head, he told her that he would kill her children. Furthermore, the evidence at trial demonstrated that Ms. Richardson pleaded with Mr. Turrentine, "Kenneth, no, no . . . ," right before he shot her. (State's Exhibit #17; T. Tr., Vol. V 838.) In light of these facts, and "after viewing the evidence in the light most favorable to the prosecution," we conclude that "[a] rational trier of fact could have found the [presence of the aggravating factor] beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The OCCA's decision, therefore, was neither contrary to nor an unreasonable application of *Jackson*; nor was it based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1)–(2). Habeas relief on this ground is accordingly denied.

### 3) Insufficient Evidence on Aggravating Circumstance Regarding "Knowingly Created a Great Risk of Death to More than One Person"

Mr. Turrentine next argues that the evidence adduced at trial was insufficient to support the jury's finding of the "great risk of death to more than one person" aggravator. Doc. 22, 137-39. Again, we consider this claim only as it applies to count one, the murder of Ms. Richardson; and again we ask "whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the [presence of the aggravating factor] beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

Oklahoma law furnishes the substantive elements of the "great risk of death to more than one person" aggravator, *see Valdez*, 373 F.3d at 1097, and makes clear that "killing more than one person is sufficient to support this aggravating circumstance." *Hooker v. State*, 887 P.2d 1351, 1364 (Okla. Crim. App. 1994). This principle is well settled under Oklahoma law. *See Torres v. State*, 962 P.2d 3, 25 (Okla. Crim. App. 1998); *Hain v. State*, 919 P.2d 1130, 1147 (Okla. Crim. App. 1996); *Cargle v. State*, 909 P.2d 806, 831 (Okla. Crim. App. 1995); *Stafford v. State*, 853 P.2d 223, 225 (Okla. Crim. App. 1993); *Sellers v. State*, 809 P.2d 676, 691 (Okla. Crim. App. 1991).

Accordingly, the OCCA found that the aggravator was sufficiently supported by the "evidence of [Mr. Turrentine] shooting and killing three people in the same home." *Turrentine I*, 965 P.2d at 978. The district court denied habeas relief on the same grounds, and we agree. If the "great risk of death" aggravator is satisfied where the defendant has killed more than one person, then it is obvious in Mr. Turrentine's case that "[a] rational trier of fact could have found the [presence of the aggravating factor] beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

In response, Mr. Turrentine argues that the "great risk of death" aggravator

requires "[s]omething more" than a showing that the defendant intentionally murdered several victims. Appellant's Br. at 91. In fact, he argues, unless this aggravator requires something more—Mr. Turrentine makes no attempt to define what "something more" might be—it is unconstitutional as applied to his case because it fails to adequately narrow the discretion of the sentencer. "Otherwise, every defendant charged with two or more homicides immediately becomes eligible for the death penalty for each offense in violation of the Eighth and Fourteenth Amendments." *Id.*

We have rejected this argument before. In *Cartwright v. Maynard*, 802 F.2d 1203, 1221-22 (10th Cir. 1986), we held that there was "no constitutional infirmity" in Oklahoma's application of the "great risk of death" aggravator, citing a string of Oklahoma cases that upheld the aggravator based on the mere fact that the defendant killed more than one victim. *Id.*; *see also Brecheen v. Reynolds*, 41 F.3d 1343, 1360-61 (10th Cir. 1994); *Ross v. Ward*, 165 F.3d 793, 800-01 (10th Cir. 1999). In *Brecheen*, we further explained that the aggravator sufficiently narrows the discretion of the sentencer because it "cannot reasonably be said to apply to every defendant convicted of murder"—on the contrary, it "only applies to a defined and limited subclass of murderers, namely, those where the defendant's conduct not only resulted in murder, but also posed a significant risk of death to other individuals." *Brecheen*, 41 F.3d at 1360. We

are bound by these precedents and therefore reject Mr. Turrentine's assertion of the same constitutional argument here.

In sum, we find that the "great risk of death" aggravator, as applied to Mr. Turrentine, complies with the Constitution. We also find sufficient evidence to support the aggravator under *Jackson*. We therefore refuse to grant habeas relief under either 28 U.S.C. § 2254(d)(1) or 28 U.S.C. § 2254(d)(2).

C. Other Evidentiary Issues

1) Improper Admission of Victim Impact Evidence

Mr. Turrentine claims that the testimony of Jerry Richardson, Ms. Richardson's husband and the father of Martise and Tina, which was offered as victim impact testimony during the second stage of the trial, violated his right to due process under the Fourteenth Amendment. The OCCA denied this claim of error on direct appeal, *Turrentine I*, 965 P.2d at 980-82, and the district court denied habeas relief on the same claim. Dist. Ct. Op. 51-55.

Mr. Richardson read his victim impact statement to the jury toward the end of the State's case in the second stage proceeding. He began: "I'm Jerry Richardson, Martise's father, Tina's father, and Anita's husband. I, Jerry Richardson, am here today to represent my family, Anita, Tina and Martise, who met with an untimely death on June 4th, 1994. They were shot in the head." (T. Tr., Vol. VI, 1005.) At this point, Mr. Turrentine's counsel objected that the

statement was characterizing the crime, in violation of *Payne v. Tennessee*, 501 U.S. 808 (1991). The trial court overruled the objection, and Mr. Richardson continued: "They were shot in the head, a tragic and wrongful death. Anita Richardson, my wife, was shot in the back of the head, while on the phone with 911. Martise Richardson, age 13, was shot in the forehead while protecting his mother. This was a brutal murder for no reason." (T. Tr., Vol. VI, 1006.) Defense counsel again objected to the testimony as a violation of *Payne*, and the court again overruled. Mr. Richardson then described each victim and the effect of their death on him and other family members, concluding with a request that the jury "let justice be done." (T. Tr., Vol. VI, 1008.) The following then transpired:

> MR. RICHARDSON: Please let justice be done –
>
> MR. ROWAN: [defense counsel] Your Honor, objection. May I approach the bench?
>
> THE COURT: All right. (The following proceedings were conducted at the bench, out of the hearing of the jury.)
>
> MR. PRIDDY: [prosecutor] Judge, this is his statement, just that justice be - -
>
> MR. ROWAN: Your Honor, the comment let justice be done is nothing but a blatant request for the death penalty, nothing but a blatant request for the death penalty, and I object and move for a mistrial.
>
> THE COURT: What's your response?

MR. PRIDDY: Judge, it's no request for any form of punishment. It's just a request that justice be done.

THE COURT: All right. I'll overrule it. (The following proceedings were conducted within the hearing of the jury.)

MR. PRIDDY: Please continue Mr. Richardson.

MR. RICHARDSON: Thank you. Please let justice be done in the murders of my family, the murders of our family, Anita, Tina and Martise. I only dream and hope today is [sic] that the truth will come out and that justice will prevail, then maybe our family can rest in peace.

*Id.* at 1008-09.

Mr. Turrentine asserts three basic flaws in Mr. Richardson's victim impact testimony: 1) the statement improperly characterized the murders, 2) the call to "let justice be done" should have been excluded as "a thinly veiled recommendation of the death sentence," and 3) the trial court should have instructed the jury on how it could use the victim impact statement in its sentencing decision. Appellant's Br. at 99-100. These flaws, he argues, rendered the sentencing hearing so fundamentally unfair that the resulting sentence violates due process. This argument is based on *Payne*, where the Supreme Court overruled portions of its decisions in *Booth* and *South Carolina v. Gathers*, 490 U.S. 805 (1989), and held that the Eighth Amendment erects no *per se* bar to victim impact evidence. 501 U.S. at 827. The Court acknowledged that "[a] State may legitimately conclude," as Oklahoma has, *see* Okla. Stat. tit. 21, §

-34-

701.10(c) (1992), "that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* In most cases, such evidence "serves entirely legitimate purposes." *Id.* at 825. But in some cases, victim impact evidence is "so unduly prejudicial that it renders the trial fundamentally unfair" in violation of the due process clause of the Fourteenth Amendment. *Id.* Mr. Turrentine argues that this is "exactly what transpired in his case." Appellant's Br. at 101.[2]

This argument requires us to determine whether Mr. Richardson's testimony was "so unduly prejudicial that it render[ed] the [sentencing hearing] fundamentally unfair." *Payne*, 501 U.S. at 825. Because the OCCA rejected this claim on the merits, however, our review is limited to the question of whether its decision was contrary to or involved an unreasonable application of *Payne*. 28

---

[2]Mr. Turrentine does not argue that the victim impact statement violates the Eighth Amendment as interpreted by the Supreme Court in *Booth v. Maryland*, 482 U.S. 496 (1987). *Booth* held—and the Supreme Court's subsequent decision in *Payne* left undisturbed, *see Hain v. Gibson*, 287 F.3d 1224, 1238-39 (10th Cir. 2002)—that "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." *Payne*, 501 U.S. at 830 n. 2. Had Mr. Turrentine argued that Mr. Richardson's testimony violated *Booth* in addition to *Payne*, we would need to determine whether the OCCA's decision was contrary to or involved an unreasonable application of *Booth* and, if so, whether the error was harmless. *See Hooper v. Mullin*, 314 F.3d 1162, 1174 (10th Cir. 2002). But since Mr. Turrentine has not advanced this argument, we need not address it. *Abercrombie*, 896 F.2d at 1231.

-35-

U.S.C. § 2254(d)(1). We conclude, as did the district court, Dist. Ct. Op. 51-55, that it was not.

Particularly instructive on this issue is our decision in *United States v. Chanthadara*, 230 F.3d 1237, 1274 (10th Cir. 2000). There, the jury heard victim impact statements from the victim's husband and two children, ages seven and ten. *Id.* at 1274. The husband supplied the jury with numerous color photos of the victim while she was alive, and the two children ended their testimony in tears. *Id.* After the sentencing hearing, in the jury room, the jury viewed letters the children had written to their dead mother and a daily journal describing one child's loss. *Id.* In spite of the inflammatory nature of this evidence, we concluded that the evidence was not so prejudicial as to render the proceeding fundamentally unfair. *Id.* In this case, compared to *Chanthadara*, the jury heard substantially less victim impact evidence, and the evidence it did hear was less emotionally charged. Mr. Richardson's isolated comment that the murder of Martise was "brutal," while likely improper, was not so inflammatory as to render the sentencing proceeding fundamentally unfair. Nor was the enigmatic request to "let justice be done" or the lack of a special instruction on victim impact evidence enough to tip the scales. We therefore conclude that the OCCA's decision was neither contrary to nor involved an unreasonable application of *Payne* and, accordingly, deny habeas relief on this issue.

### 2) Improper Refusal to Allow Mitigating Evidence Regarding State of Mind

Mr. Turrentine next argues that the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by excluding certain mitigating evidence from the sentencing stage of his trial. Specifically, Mr. Turrentine sought to introduce the expert testimony of one Dr. Smith, who would have testified to Mr. Turrentine's diminished capacity at the time of the murders. Although the trial court admitted similar evidence at the guilt stage of the trial, it excluded Mr. Smith's testimony from the sentencing stage. Mr. Turrentine now claims that the exclusion of this mitigating evidence was improper under *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982), which held that sentencing courts may not "refuse to consider, as a matter of law, . . . relevant mitigating evidence." (emphasis omitted)

As Mr. Turrentine concedes, however, Reply Br. at 16-18, this claim is procedurally barred because it was not raised on direct appeal. We may consider it only if Mr. Turrentine can demonstrate either "cause for the default and actual prejudice resulting from the alleged violation of federal law," or, alternatively, "that failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Mr. Turrentine argues that the "cause for the default" was his appellate counsel's ineffective assistance in failing to appeal the evidentiary issue. *See*

-37-

*Ellis v. Hargett*, 302 F.3d 1182, 1186 (10th Cir. 2002) ("A showing that a defendant received ineffective assistance of counsel will establish cause excusing a procedural default."). Ineffective assistance claims are governed by the familiar two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984), under which the petitioner "must establish that (1) counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different." *Hain*, 287 F.3d at 1231. Application of *Strickland* requires us to "look to the merits of the omitted issue." *Id.* But before we look to the merits, we note that the OCCA has already addressed Mr. Turrentine's claim of ineffective assistance of appellate counsel. *Turrentine II*, 965 P.2d at 990. AEDPA therefore confines our review to the question of whether the OCCA's decision was contrary to or involved an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d)(1); *see Hain*, 287 F.3d at 1231.

With regard to the first prong of *Strickland*—whether counsel's performance was objectively unreasonable—the OCCA pointed out that "[a]ppellate counsel filed a well written, thoroughly researched brief raising numerous claims at least equally meritorious to those which were omitted and are at issue here." *Turrentine II*, 965 P.2d at 990. Moreover, Mr. Turrentine failed to show "that appellate counsel's judgment was unreasonable under the

circumstances or did not fall within the wide range of professional assistance owed to a client by an attorney." *Id.* (internal quotation omitted). Thus, having concluded that appellate counsel's performance satisfied an objective standard of reasonableness, the OCCA rejected Mr. Turrentine's ineffectiveness claim. We would also add that under the second prong of *Strickland*, Mr. Turrentine must demonstrate a reasonable probability that, but for his appellate counsel's failure to appeal the evidentiary issue, the outcome of the proceedings would have been different. The record demonstrates that during the initial stage of the trial, counsel introduced considerable evidence on Mr. Turrentine's diminished capacity at the time of the murders. The jury considered the evidence and refused to reduce the offenses from first degree murder to a lesser degree of homicide. We fail to see how the introduction of expert testimony covering the same ground—"[Mr.] Turrentine's inability to formulate specific intent at the time he shot and killed his family members," as Mr. Turrentine's brief puts it, Br. at 107—would have had a significant impact on the jury's sentence. An appeal of this issue, therefore, would have been unlikely to result in a reversal of Mr. Turrentine's sentence. With this in mind, and in light of *Strickland*'s mandate that "[j]udicial scrutiny of counsel's performance . . . be highly deferential," 466 U.S. at 689, we cannot say that appellate counsel's decision to focus on other, presumably more promising, issues was constitutionally deficient.

The OCCA's decision, therefore, was neither contrary to nor involved an unreasonable application of *Strickland*. Because the ineffective assistance claim fails, Mr. Turrentine has also failed to demonstrate adequate cause for his procedural default. The underlying claim is therefore procedurally barred, and we deny habeas relief on that ground.

### 3) Evidence of Mitigation Outweighed Evidence of Aggravation

Mr. Turrentine next contends that his death sentence violates the Eighth and Fourteenth Amendments for two reasons: first, because the mitigating evidence outweighed the aggravating evidence; and second, because the OCCA failed adequately to reweigh the aggravating and mitigating factors on appeal.

As for the first argument, the parties agree that the relevant question on review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the aggravating evidence outweighed the mitigating evidence. *Jackson*, 443 U.S. at 319. Although the OCCA did not directly cite *Jackson*, it applied an analogous state standard, asking "whether there was sufficient evidence from which a rational sentencer could find that the balance of aggravating and mitigating circumstances warranted a death sentence." *Turrentine I*, 965 P.2d at 979 (citing *Spuehler v. State*, 709 P.2d 202, 203-04 (Okla. Crim. App. 1985), which relied on *Jackson*). We therefore ask whether the OCCA's decision was contrary to or involved an

-40-

unreasonable application of *Jackson*, or whether it was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1)–(2).

Mr. Turrentine has failed to demonstrate that the OCCA's decision was lacking in either respect. He simply lists the relevant aggravating and mitigating evidence and asserts, without argument, that "the mitigation evidence in this . . . case so outweighs the evidence of aggravation that the OCCA's adjudication of this issue resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented." Appellant's Br. at 114-15. This is not enough for us to conclude that the OCCA's decision fails the deferential standard of review under AEDPA, especially in light of the substantial evidence before the court that the murders were especially heinous, atrocious, or cruel, that Mr. Turrentine knowingly created a great risk of death to more than one person, and that there existed a probability that Mr. Turrentine would commit acts of violence constituting a continuing threat to society. The OCCA's decision was based on a reasonable determination of the facts and application of *Jackson*, and we therefore deny habeas relief on this ground.

Mr. Turrentine also argues that the OCCA failed to adequately reweigh the aggravating and mitigating factors on appeal. When a state appellate court finds that a death sentence has been based in part on an improper aggravating

circumstance, it may still uphold the death sentence if it finds, after reweighing the evidence, that the remaining aggravating circumstances outweigh the mitigating circumstances. *Clemons v. Mississippi*, 494 U.S. 738, 741 (1990). But the state appellate court must, at a minimum, "actually reweigh[]" the evidence. *Richmond v. Lewis*, 506 U.S. 40, 48 (1992). Mr. Turrentine claims that the OCCA failed to actually reweigh the evidence for count three after it invalidated the "heinous, atrocious, or cruel" aggravating circumstance as applied to that count. However, because we have already granted habeas relief on count three, we need not address this issue.

### D.    Ineffective Assistance of Trial Counsel

Mr. Turrentine has argued seven grounds for ineffective assistance of trial counsel: 1) Trial counsel failed to present expert testimony concerning Mr. Turrentine's mental health, as he promised to do in opening argument; 2) Trial counsel conceded an aggravating circumstance; 3) Trial counsel failed to present evidence of diminished capacity and failed to obtain instructions on lesser included offenses; 4) Trial counsel failed to respond to the State's motion in limine to exclude evidence of Mr. Turrentine's mental state; 5) Trial counsel conceded Mr. Turrentine's guilt; 6) Trial counsel failed to obtain from the county jail medical records pertinent to Mr. Turrentine's competence to stand trial; 7) Trial counsel failed to investigate and present mitigating evidence on Mr.

-42-

Turrentine's history of childhood abuse.

The OCCA found against Mr. Turrentine on the first two claims, which Mr. Turrentine had raised on direct appeal, and the district court agreed with that disposition. The OCCA found that Mr. Turrentine had defaulted on his remaining ineffectiveness claims by failing to directly appeal them; the district court nevertheless reviewed those claims de novo and found them to be meritless.

### 1)  Ineffective Assistance Standard

Claims of ineffective assistance of counsel are mixed questions of law and fact. *Wallace v. Ward*, 191 F.3d 1235, 1247 (10th Cir. 1999) (applying AEDPA). As noted above, these claims are governed by the two-part *Strickland* test, under which the petitioner "must establish [1] that counsel's performance was constitutionally deficient and [2] that counsel's performance prejudiced the defense, depriving the petitioner of a fair trial with a reliable result." *Boyd v. Ward*, 179 F.3d 904, 913 (10th Cir. 1999), *citing Strickland*, 466 U.S. at 687. To prove deficient performance, Mr. Turrentine "must overcome the presumption that counsel's conduct was not constitutionally defective." *Wallace*, 191 F.3d at 1247. "Judicial scrutiny of counsel's performance is highly deferential." *Id.* Mr. Turrentine must demonstrate that counsel's performance was not merely wrong, but fell below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

If Mr. Turrentine demonstrates that counsel's performance was deficient, he still must show prejudice before a reviewing court may rule in his favor. In order to show prejudice, Mr. Turrentine must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. When a petitioner challenges conduct during the sentencing stage of the trial, he must demonstrate "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Stafford v. Saffle*, 34 F.3d 1557, 1564 (10th Cir. 1994) (quoting *Strickland*, 466 U.S. at 695).

When addressing a claim of ineffective assistance of counsel, the reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. This is especially true when we examine counsel's decision to investigate—or not to investigate—matters that materially affect a defendant's case. As the Supreme Court has observed:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a

reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

> 2)      Claims Raised on Direct Appeal

> a.      In contravention of his promise to do so in opening argument, trial counsel failed to present expert testimony concerning Mr. Turrentine's mental health.

Mr. Turrentine's counsel declared in his opening argument that he would present a mental health expert, which he ultimately failed to do. According to Mr. Turrentine, this failure constituted ineffective assistance of counsel. The OCCA applied *Strickland* and rejected this argument on the merits. We therefore ask whether its decision was contrary to, or an unreasonable application of, *Strickland*; or whether it was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1)–(2).

The OCCA concluded that Mr. Turrentine had failed to establish either deficiency or prejudice under *Strickland*. With respect to deficiency, the OCCA observed:

> Based upon this record, counsel's decision not to call the mental health professionals during first stage appears to have been a strategic decision. After hearing all of the State's evidence, counsel seemed to focus the defense on intoxication and not insanity. Focusing and narrowing the defense based upon the State's evidence is a valid strategy. This Court has declined to second guess trial strategy on appeal. That the strategy proved unsuccessful is not

-45-

grounds for branding counsel ineffective. Absent a showing of incompetence, the appellant is bound by the decisions of his counsel and mistakes in tactic and trial strategy do not provide grounds for subsequent attack.

*Turrentine I*, 965 P.2d at 971 (internal citations omitted). And with respect to prejudice:

[T]he record does not support a claim that counsel's decision rendered the trial fundamentally unfair or the verdict unreliable. Evidence of premeditation and that the Appellant was in control of his mental faculties at the time of the murders was substantial. Testimony of Appellant's depressed state was presented by Appellant himself, by his sister and through a physician's assistant at the Veteran's Administration Hospital who had seen Appellant the day of the murders and prescribed anti-depressant medication. The absence of the mental health professionals did not deny Appellant the ability to present his defense.

*Id.*

We cannot conclude that this analysis fails the deferential standard of review under AEDPA. Mr. Turrentine must show more than that his counsel's action had "some conceivable effect on the outcome of the proceeding," because "[v]irtually every act or omission of counsel would meet that test." *Strickland*, 466 U.S. at 693. Instead, he must demonstrate that trial counsel's "omission" amounted to objectively unreasonable representation or deprived him of a fair trial with a reliable result. This, Mr. Turrentine has not done; habeas relief is accordingly denied.

### b. Trial counsel conceded an aggravating circumstance.

Mr. Turrentine contends that trial counsel conceded an aggravating circumstance in the second phase of the trial and that this concession constitutes ineffective assistance of counsel. Trial counsel made the following statement to the jury at the sentencing hearing: "You know, I concede, I concede that maybe the aggravating circumstance of great risk of death to more than one person is there. . . . You will be *authorized* to determine the death sentence in this case." T. Tr., Vol. VII, 1220 (emphasis added). However, trial counsel continued: "And that's the operative word there is authorized, not require, not shall." *Id.* After this, trial counsel proceeded to argue the mitigating factors. Given the qualifying language that counsel emphasized in his follow-up, we cannot say that his first statement amounts to objectively unreasonable representation. It could easily be viewed as a strategic choice in which trial counsel sought to garner respect for his honesty, which would bolster his credibility during his subsequent discussion of the mitigating factors. The OCCA found this to be the case, *Turrentine I*, 965 P.2d at 980, and we cannot conclude that this finding was an unreasonable application of *Strickland*. We therefore deny habeas relief.

### 3) The Procedural Bar to Claims Not Raised on Appeal.

The State argued, and the OCCA found, that claims three through seven were procedurally barred from review. The district court held that they were not.

*Turrentine II*, 965 P.2d at 987-88.

Generally, where "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner" can show either "cause for the default and actual prejudice," or, alternatively, "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. We have recognized an exception to this general rule, however, when the underlying claim is ineffective assistance of counsel. *See Osborn v. Shillinger*, 861 F.2d 612, 622-23 (10th Cir. 1988). This is because ineffective assistance claims often require a petitioner to consult with separate counsel on appeal or develop facts that do not appear in the trial record. *Brecheen*, 41 F.3d at 1363-64. Restricting the litigation of ineffective assistance claims to trial and direct review, then, "would seriously interfere with an accused's right to effective representation." *Kimmelman v. Morrison*, 477 U.S. 365, 378 (1986). We therefore have recognized exceptions to the Oklahoma procedural bar where a petitioner had the same counsel at trial and on appeal, or where the ineffectiveness claim cannot be resolved solely on the basis of the trial record. *See English v. Cody*, 146 F.3d 1257, 1264 (10th Cir. 1998).

In this case, the district court found that trial and appellate counsel differed and that therefore the first *English* exception to the Oklahoma procedural bar was

inapplicable. It also noted, however, that trial and appellate counsel worked for the same defense organization, the Oklahoma Indigent Defense System; and one might question whether close colleagues could provide the "objective assessment [of] trial counsel's performance" that a petitioner needs in order to pursue an ineffective assistance claim on direct appeal. *Brecheen*, 41 F.3d at 1364; *see also Cannon v. Mullin*, 383 F.3d 1152 (10th Cir. 2004) ("[W]hether trial and appellate attorneys from the same 'office' should be deemed 'separate' counsel will turn on the specific circumstances."). We need not address this question, however, because we agree with the district court that the claims are based on affidavits and evidence gathered after trial and cannot be resolved on the trial record alone. The Oklahoma procedural bar is therefore inapplicable.

4)     Claims Not Raised on Direct Appeal

a.     Trial counsel failed to present evidence of diminished capacity and failed to obtain instructions on first degree manslaughter.

As discussed in Section II.D.2.a. above, Mr. Turrentine argues that trial counsel rendered constitutionally deficient assistance by failing to present adequate evidence of Mr. Turrentine's diminished capacity. We have already rejected this argument, and we deny habeas relief for the reasons stated above.

Mr. Turrentine also argues that his trial counsel was deficient for failing to request an instruction on first degree manslaughter. A first degree manslaughter

-49-

instruction is warranted only when the defendant presents evidence supporting a conclusion that "the homicide was perpetrated without a design to effect death by means of a dangerous weapon." *Turrentine I*, 965 P.2d at 969-70. The OCCA found that no evidence supported such an instruction, *id.*, and we cannot say that this finding is an unreasonable determination of facts in light of the evidence. 28 U.S.C. § 2254(d)(2); *see Boyd*, 179 F.3d at 917. Thus, because the evidence did not support a first degree manslaughter instruction, trial counsel was not deficient for failing to request one. *Boyd*, 179 F.3d at 917. Habeas relief is denied.

> b. Trial counsel failed to respond to the State's motion in limine to exclude evidence of Mr. Turrentine's mental state.

Mr. Turrentine asserts that his trial counsel was ineffective for failing to respond to the State's motion in limine, which sought to exclude from the sentencing hearing expert testimony about Mr. Turrentine's mental state. We have already rejected the argument that Mr. Turrentine was prejudiced by his appellate counsel's failure to appeal the exclusion of this evidence. *See supra* Section II.C.2. For the same reasons, we reject the argument that he was prejudiced by his counsel's failure to respond to the motion in limine. Accordingly, habeas relief on this claim is denied.

> c. Trial counsel conceded defendant's guilt.

Mr. Turrentine next argues that several statements by trial counsel

amounted to a concession that Mr. Turrentine was guilty of the crimes for which he was charged.  For example, during voir dire, trial counsel referred to "these intentional homicides," and in his closing argument he told the jury: "You are going to have a second stage of this trial because only Counts 2 and Counts 3 talk about second degree murder, so there will be a first degree murder conviction in this case."  Appellant's Br. at 164.  He also stated:  "Had [the State] filed two Informations, one for first degree murder as to the two people and one for second degree murder as to the other, it would have been a plea of guilty all the way around."  *Id.*  According to Mr. Turrentine, "[s]uch remarks constituted absolute surrender" and, therefore, ineffective assistance of counsel.  *Id.* at 165.

As noted above, *Strickland* requires a showing of both deficient representation and prejudice.  In a narrow class of cases, however, including when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," *United States v. Cronic*, 466 U.S. 648, 659 (1984), prejudice is presumed.  In order to presume prejudice under *Cronic*, "the attorney's failure to test the prosecutor's case must be complete."  *Bell*, 535 U.S. at 686.  This Court has repeatedly found the *Cronic* presumption inapplicable where "counsel actively participated in all phases of the trial proceedings."  *Snyder v. Addison*, 89 Fed.Appx. 675, 680 (10th Cir. 2004); *see also Cooks v. Ward*, 165 F.3d 1283, 1296 (10th Cir. 1998) (*Cronic* inapplicable where "[counsel] was present in the

courtroom[,] . . . conducted limited cross-examination, made evidentiary objections, and gave a closing argument"); *Hooper v. Mullin*, 314 F.3d 1162, 1175 (10th Cir. 2002) (*Cronic* inapplicable where "[d]efense counsel cross-examined the State's guilt-stage witnesses, made objections to the State's evidence, presented some evidence in Petitioner's defense, and made opening and closing arguments"). In fact, we have found a complete absence of meaningful adversarial testing only where the evidence "overwhelmingly established that [the] attorney abandoned the required duty of loyalty to his client," and where counsel "acted with reckless disregard for his client's best interests and, at times, apparently with the intention to weaken his client's case." *Osborn*, 861 F.2d at 629.[3]

This is not such a case. The statements of which Mr. Turrentine complains fell within the context of a lengthy and persuasive closing argument, in which counsel contended that first degree murder was inappropriate for counts two and three. Faced with overwhelming evidence of his client's guilt, including multiple confessions by Mr. Turrentine himself—first on a 911 recording, then to several police officers at separate times, and finally at trial—counsel essentially conceded guilt on two counts in order to more persuasively argue the remaining counts and

---

[3]The Supreme Court has recently heard argument in a case that may affect the analysis on this point, *Florida v. Nixon*, No. 03-931. We decide this case under precedents at this time.

retain credibility for the sentencing phase of trial. We have upheld such strategic decisions before. *See, e.g.*, *Trice v. Ward*, 196 F.3d 1151, 1162 (10th Cir. 1999) (finding, in light of overwhelming evidence of guilt, that "it was an entirely reasonable strategy for [defendant's] trial counsel to concede [that defendant raped the victim] and focus his efforts on persuading the jury that [the defendant] did not have the intent to commit first-degree murder, and/or persuading the jury to spare [his] life"); *Charm v. Mullin*, 37 Fed. Appx. 475, 480 (10th Cir. 2002) (holding that trial counsel's concession of guilt did not trigger a presumption of prejudice where "counsel was faced with overwhelming evidence establishing [defendant's] guilt," and where counsel's "apparent strategy was to maintain credibility with the jury during the first stage so that he could strongly pursue a sentence less than death during the penalty phase"). We therefore cannot conclude that Mr. Turrentine's counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659. A presumption of prejudice is accordingly inappropriate.

Mr. Turrentine has also failed to demonstrate prejudice under *Strickland*. The required showing is a reasonable probability that, absent trial counsel's comments, the outcome of the trial would have been different. *Strickland*, 466 U.S. at 694. But as we explained above, and as the district court found, "the trial transcript and original record . . . reveal overwhelming evidence of [Mr.

Turrentine's] guilt on all four counts of first degree murder." Dist. Ct. Op. at 80. Trial counsel's remarks, therefore, "did not alter the likely outcome of the first stage of the trial." *Id.* Because Mr. Turrentine has failed to show prejudice, we deny habeas relief on this ground.

> d. Trial counsel failed to obtain from the county jail medical records pertinent to Mr. Turrentine's competence to stand trial.

Mr. Turrentine claims that his trial counsel was constitutionally deficient for not gathering from the Tulsa County Jail medical records disclosing the amount of medication he took during his incarceration and subsequent trial. According to Mr. Turrentine, the medical records, which indicated that he was taking a high dosage of the antidepressant Elavil, would have cast doubt on his competency to stand trial. However, as Mr. Turrentine concedes in his brief, "[his] response to the medication was never documented." Br. at 174. In fact, as the district court found, the record amply demonstrates that he was competent to stand trial. He understood the charges against him, and the evidence shows that he was able to communicate with counsel and testify competently on his own behalf. Dist. Ct. Op. at 82; *see Hatch v. Oklahoma*, 58 F.3d 1447, 1456-58 (10th Cir. 1995) (evidence of a petitioner's lucid and intelligible testimony at trial refutes claim of trial counsel's failure to argue competency). Mr. Turrentine has thus failed to demonstrate prejudice, and habeas relief is accordingly denied.

### e. Trial counsel failed to investigate and present mitigating evidence on Mr. Turrentine's history of childhood abuse.

Finally, Mr. Turrentine argues that his trial counsel was constitutionally deficient for failing to investigate and present evidence of Mr. Turrentine's history of childhood abuse. According to Mr. Turrentine, the outcome of the sentencing hearing would have been different if counsel had presented this evidence, because "the jury would have learned of the physical and psychological abuse [Mr.] Turrentine suffered as a child, and come closer to understanding [Mr.] Turrentine himself." Appellant's Br. at 179.

Counsel called nine witnesses during the second phase of the trial, and each one testified to mitigating circumstances on Mr. Turrentine's behalf. As is always the case, trial counsel could have done more. But the question under *Strickland* is not whether counsel could have done more, but whether counsel's decision not to do more was "[objectively unreasonable] in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. We agree with the district court that counsel's conduct was not so unreasonable that it "render[ed] [Mr. Turrentine's] trial fundamentally unfair." Dist. Ct. Op. at 83. To conclude otherwise would be to indulge the very "distorting effects of hindsight" that *Strickland* is designed to eliminate. 466 U.S. at 689. Counsel's

conduct was reasonable under the circumstances, and habeas relief on this ground is therefore denied.

## Conclusion

For the reasons set forth above, we GRANT Mr. Turrentine's Petition for Writ of Habeas Corpus on counts two and three, and VACATE his conviction and sentence on counts two and three accordingly. However, we DENY his Petition for Writ of Habeas Corpus on count one, and AFFIRM his conviction and capital sentence on count one.