**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 15, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

KEVIN YOUNG,

        Petitioner - Appellant,

v.

MARTY SIRMONS, Warden,
Oklahoma State Penitentiary,

        Respondent - Appellee.

No. 05-6282

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-01-1551-M)**

---

Mark Barrett, Norman, Oklahoma for Petitioner - Appellant.

Preston Saul Draper, Assistant Attorney General (W.A. Drew Edmondson,
Attorney General of Oklahoma with him on the briefs), Oklahoma City,
Oklahoma for Respondent - Appellee.

---

Before **KELLY**, **LUCERO**, and **TYMKOVICH**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

Kevin Young was convicted of first degree murder for shooting and killing

Joseph Sutton during a robbery at the Charles Steak House (the "Steak House").

A unanimous jury sentenced him to death. He filed a 28 U.S.C. § 2254 petition in

federal district court in Oklahoma, seeking relief from both his conviction and sentence. The court denied Young's petition, but granted him a certificate of appealability ("COA"), pursuant to 28 U.S.C. § 2253(c), on the following claims: (1) There was insufficient evidence to support his conviction; (2) His constitutional rights were violated when the trial court failed to instruct the jury on the lesser-included offenses of second degree murder and first degree manslaughter; (3) Counsel was ineffective during the guilt stage of the trial in failing to obtain the services of a crime-scene reconstructionist; and (4) Counsel was ineffective during the sentencing stage of the trial in failing to proffer certain mitigation evidence. We granted Young a COA on an additional issue: Whether witness testimony identifying Young as the assailant was improperly admitted due to law enforcement's use of a flawed identification procedure. Exercising jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253, we **AFFIRM**.

**I**

We are required to presume, subject to rebuttal by clear and convincing evidence, that the factual findings of the Oklahoma Court of Criminal Appeals ("OCCA") are correct. 28 U.S.C. § 2254(e)(1). Those facts are as follows:

> This case arose from a shooting during an attempted robbery at the Charles Steak House in Oklahoma City in the early morning hours of May 14, 1996, where Joseph Sutton ran a gambling operation in a back room. Sometime after midnight on May 14, 1996, two African-American men, armed with guns, entered the Charles Steak House, and walked into the gaming room.

-2-

Karl Robinson testified the taller man said "all you SOBs are going to die." George Edwards heard the same man say he was going to kill everyone. When Edwards saw the taller man pull a gun, Edwards grabbed the gun and held it in the air while the taller man fired it repeatedly until the gun was emptied. At this same time, the shorter of the two men pulled his gun, pointed it in the air and said "we come for the money." Joseph Sutton threw something on the floor, pulled his own gun, pointed it at the shorter man and tried to fire it, but a bullet was not chambered and the gun did not fire. The shorter man then fired on Sutton.

Sutton was shot four times and died as a result of a gunshot wound to his abdomen. Quintin Battle, who was in between Sutton and the shorter gunman, was shot twice during the gunfire. Battle testified he dropped to the floor when the shooting began, because he feared he would be shot and killed. George Edwards suffered powder burns on his arms and face while struggling with the taller gunman.

Both gunmen ran from the Charles Steak House after the shooting. One ran down North Lottie, away from the restaurant, holding his arm.

Within minutes of the shooting, Appellant arrived at Presbyterian Hospital emergency room with three gunshot wounds. He told emergency personnel his name was "Roy Brown." He had a bullet in his left chest, another bullet wound to his right thigh, and a third grazing wound to his right shoulder. Hospital personnel reported the gunshot victim to the police.

Officer Cook, who was responding to the Charles Steak House shooting, heard dispatch report a gunshot victim at Presbyterian Hospital. He went to the hospital and asked "Roy Brown" if he was at the Charles Steak House. Appellant told officer Cook he had not been there and said he was shot near a 7-11 convenience store and an Autozone store. Appellant told officer Cook he rode a bus to the hospital and did not know where he was shot because he was from out of state. Officer Cook testified he knew Metro Transit buses did not operate after midnight and he suspected "Roy Brown" had in fact been involved in the Charles Steak House shooting. He contacted officers at the shooting scene and asked if any witnesses there could identify the shooter.

-3-

Appellant also spoke with Officer Smith at the hospital and gave him a different date of birth than he gave officer Cook. He told officer Smith he was shot near a 7-11 convenience store and an Autozone store, but said he did not know how he got to the hospital.

Within thirty (30) minutes of the shooting, Karl Robinson and Ben Griffin were brought separately to the hospital to see if they could identify the person in the emergency room. Karl Robinson saw Appellant lying on a gurney. Robinson was unsure whether Appellant was one of the gunmen until he saw Appellant's shirt on the floor. He told the officers the shirt looked the same. Robinson was unable to identify Appellant at the preliminary hearing, but positively identified Appellant at trial.

Ben Griffin thought Appellant was one of the shooters and asked to see the shirt he was wearing. After he saw the shirt, he too affirmatively identified Appellant as one of the shooters. Griffin could not identify Appellant at preliminary hearing and did not try to identify him at trial.

No weapons were recovered at the scene of the shooting. However, a .38 caliber Smith and Wesson revolver containing six spent shell casings was found in a trash can about two blocks from Presbyterian Hospital. The woman who found the gun heard someone drop it in her curbside garbage can around 12:30 a.m. on May 14, 1996. The deceased's Sphinx .380 semiautomatic pistol was given to police officers by the owner of the restaurant a couple of days after the shooting. The owner obtained the gun from the restaurant manager who had hidden the gun and taken the deceased's wallet and money from his pockets immediately after the shooting. Police officers also recovered a .9mm [sic] handgun and $500.00 from a van belonging to Ben Griffin.

Ballistics and firearms testing were done on the recovered weapons, projectiles and casings found at the scene and recovered from the deceased. Four full metal jacket bullets recovered from the shooting scene were .380 caliber and were determined to have been fired from the deceased's gun. Eight .380 caliber auto fired casings were found to be consistent with having been fired from the deceased's gun. Two lead projectiles found at the scene had insufficient markings for ballistics comparison. Two copper jacket projectiles could not have

-4-

been fired from any gun recovered. One projectile found at the scene was consistent with having been fired from the .38 caliber Smith and Wesson revolver that was found in the trash can. Two bullets recovered from the deceased were consistent with having been fired from the .38 caliber Smith and Wesson revolver. All six casings found in the .38 caliber Smith and Wesson were positively identified as having been fired from that gun.

Blood samples were collected from the shooting scene and were also taken from the deceased Joseph Sutton, Quintin Battle, the codefendant Antwuan Jackson, and from Appellant. Of three blood swabbings collected from the scene, one positively matched the deceased's blood sample, another did not match any known sample, and the third positively matched Appellant's blood sample. DNA testing confirmed a positive match of the blood sample collected from the shooting scene with Appellant's blood sample. Two DNA forensic chemists testified to the positive match, and one estimated the combined probability results of a match would occur in the African-American population only one in one hundred thirty-two million times (1:132,000,000).

Around 6:30 a.m. on May 14, Appellant was released to Oklahoma City police custody. A bullet remained in his back left side, below his shoulder blades. Over a year later, Appellant saw the county jail doctor complaining of pain and drainage from where the bullet was embedded. The doctor prescribed antibiotics, but Appellant never returned to have the bullet removed. Dr. Jett, a surgeon, saw Appellant about four weeks later for the purpose of removing the bullet, and determined the bullet was no longer there. Dr. Jett testified a fresh wound was present where the bullet should have been.

Young v. State, 12 P.3d 20, 27-31 (Okla. Crim. App. 2000) (footnotes and alterations omitted).

On May 22, 1996, Young and his co-defendant, Antwuan David Jackson, were each charged with Murder in the First Degree (malice aforethought), in violation of Okla Stat. tit. 21, § 701.7(A) ("Count One"), Attempted Robbery with

Firearms in violation of Okla. Stat. tit. 21, § 801 ("Count Two"), and Shooting with Intent To Kill in violation of Okla. Stat. tit. 21, § 652 ("Count Three"). Young and Jackson were tried separately, and Jackson was acquitted on all counts. A jury convicted Young on all three counts.

During the second stage of the trial, the state sought the death penalty based on three aggravating factors: (1) Young had been previously convicted of a felony involving the use or threat of violence to a person; (2) There was a strong probability that Young would commit criminal acts of violence that would constitute a continuing threat to society; and (3) Young knowingly engaged in conduct that posed a great risk of death to multiple persons. Young stipulated that in 1991 he was convicted in California state court of shooting into an occupied vehicle, second degree robbery, and assault with a firearm. In support of the aggravating factors, the state relied on evidence it presented during the guilt stage of the trial, and presented a letter read by the victim's daughter as victim impact evidence. Young presented three witnesses in mitigation. Fredrick Smith, a record keeper for the county jail, testified that no disciplinary reports had been filed against Young during his two years of incarceration. Smith admitted, however, that he had never had any personal contact with Young, nor spoken with anyone who had. Next, Dr. Phillip Murphy testified that, based on tests he conducted on Young and his personal examination of the defendant, it was his opinion that Young did not pose a continuing threat to society if he

remained in a structured prison environment. Finally, Young's sister, Linda McZeal, testified that Young had lived with her for most of his childhood, and that during that time he was an intelligent, caring, helpful, and well-behaved child. McZeal testified that after he left her home his problems began, and he started to run afoul of the law.

The jury found unanimously that all three aggravating circumstances were present, and, after weighing them against the mitigating circumstances, recommended a death sentence on Count One. The jury also recommended sentencing Young to 20 years' imprisonment and 30 years' imprisonment for Counts Two and Three, respectively. The trial court adopted the jury's recommendations in full, and ordered that both terms of imprisonment would run consecutively to Count One.

Young appealed his convictions and sentence to the OCCA. On September 6, 2000, both his convictions and sentence were affirmed by the OCCA. Young v. State, 12 P.3d 20. Young filed a petition for post-conviction relief in state court, which was denied by the OCCA. Young v. State, No. PCD-2000-13 (Okla. Crim. App. Oct. 31, 2000). On May 24, 2002, Young filed an application for habeas relief in federal district court. The district court denied his petition. Young v. Mullin, No. CIV-01-1551-M, 2005 WL 1828542 (W.D. Okla. July 29, 2005). The court granted Young a COA, pursuant to 28 U.S.C. § 2253(c), with respect to the following claims: (1) Oklahoma failed to present sufficient evidence to sustain

-7-

his first degree murder conviction; (2) The jury should have received instructions on the lesser-included offenses of second degree murder and first degree manslaughter; (3) Counsel was ineffective in failing to present testimony from a crime-scene reconstructionist that would have disputed the state's claim that Young must have fired the shot that killed Sutton; and (4) Counsel was ineffective during the sentencing stage of the trial in failing to proffer certain mitigation evidence. We granted Young a COA on an additional issue: Whether witness testimony identifying Young as the assailant was improperly admitted due to law enforcement's use of a flawed identification procedure.

**II**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs our review of Young's petition, and provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). When a petitioner seeks relief under the first prong of AEDPA we first ask whether the "principle of federal law invoked by the

petitioner was clearly established by the Supreme Court at the time of the state court judgment." Turrentine v. Mullin, 390 F.3d 1181, 1189 (10th Cir. 2004). A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." Torres v. Lytle, 461 F.3d 1303, 1311 (10th Cir. 2006) [hereinafter "Torres II"]. A decision is an "unreasonable application" of clearly established federal law only "if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. We do not apply AEDPA's deferential review standard when a federal district court holds an evidentiary hearing and considers new evidence that was not before the state court at the time it reached its decision, even if the state court resolved the claim on the merits. Id. (citing Bryan v. Mullin, 335 F.3d 1207, 1215-16 (10th Cir. 2003) (en banc)). When a petitioner seeks relief under the second prong of AEDPA, the petitioner bears the burden of showing by clear and convincing evidence that the state court's factual determination is erroneous. 28 U.S.C. § 2254(e)(1); Turrentine, 390 F.3d at 1188-89. We review the district court's application of AEDPA's standards de novo. Goss v. Nelson, 439 F.3d 621, 626 (10th Cir. 2006).

"If the state court did not decide a claim on the merits, and it is not

-9-

otherwise procedurally barred, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error." Spears v. Mullin, 343 F.3d 1215, 1225 (10th Cir. 2003) (citation omitted). However, "when . . . the district court's findings of fact are based merely on a review of the state record, we do not give them the benefit of the clearly erroneous standard but instead conduct an independent review." Id. (quotation omitted); see also Turrentine, 390 F.3d at 1189. As we embark upon our review of Young's petition, we are mindful that "our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." Mitchell v. Gibson, 262 F.3d 1036, 1063 (10th Cir. 2001) (citation omitted).

### III

Young argues that admission of a witness' in-court identification of Young as one of the individuals who attempted to rob the Steak House violated his Fourteenth Amendment due process rights and Sixth Amendment right under the Confrontation Clause. He raises two distinct challenges. First, he argues that it was contrary to, or an unreasonable application of, Supreme Court precedent for the OCCA to hold that the in-court identification was admissible, when the witness first identified Young during an impermissibly suggestive pre-trial, one-person "show-up." Second, he argues that the OCCA's holding that the identification was reliable was based on an unreasonable determination of the facts in light of the record.

-10-

At trial, the government offered testimony by Karl Robinson that Young was the shorter of the two men he saw walk into the Steak House. Robinson further testified that he identified Young as the shorter man at the hospital shortly after the crime occurred. Counsel for Young objected to the reliability of this testimony, arguing that the suggestive nature of the show-up procedure used to obtain Robinson's initial identification tainted his testimony and rendered it inadmissable.

In Stovall v. Denno, 388 U.S. 293 (1967), the Court addressed whether a severely injured victim's identification of the defendant shortly after the crime was unnecessarily suggestive, and thus inadmissible, when the police brought the defendant to the hospital and asked the victim if "he was the man." Id. at 295, 301-02. Defendant claimed the process was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] was denied due process of law." Id. at 302. Although the Court recognized that the "practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned," it nonetheless held that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it." Id. The Court found that at the time the defendant was brought to the hospital, the officers were "[f]aced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that [the victim, who had been seriously wounded,] could not

-11-

visit the jail." Id. Under the totality of the circumstances, the Court held the identification was admissible. Id.

Ten years later, the Court addressed whether, as Young now argues, Stovall prohibits the admission of extrajudicial identifications resulting from one-person show-ups in cases that do not present the same "need for immediate action." In Manson v. Brathwaite, 432 U.S. 98, 114 (1977), the Court rejected adopting a per se rule excluding such evidence. Even if the identification was unduly suggestive, the Court held that the admissibility determination – both the admission of the extrajudicial identification and any subsequent in-court identification – must turn on reliability. Id. Reliability, it held, is properly assessed via consideration of five factors, which must be weighed against the suggestiveness of the identification method: (1) the prior opportunity of a witness to observe the defendant during the alleged criminal act; (2) the degree of attention of the witness; (3) the accuracy of the witness' prior description; (4) the witness' level of certainty; and (5) the time between the crime and the confrontation. Id.

In rejecting Young's claim, the OCCA determined that even if the identification procedure was unnecessarily suggestive, it was admissible if it satisfied the five-factor test outlined in Manson:

> Even if we were to find the "show up" was unduly suggestive and encouraged misidentification, the same would not automatically invalidate the subsequent in-court identification if that identification

-12-

can be established as independently reliable under the totality of the circumstances. This Court uses a test that includes consideration of all the surrounding circumstances plus the following:
1) prior opportunity of the witness to observe the defendant during the alleged criminal act;
2) degree of attention of the witness;
3) accuracy of the witness' prior identification;
4) the witness' level of certainty; and,
5) the time between the crime and the confrontation.

Young, 12 P.3d at 34 (citations omitted). This approach is entirely consistent with the existing Supreme Court precedent discussed supra. Accordingly, the legal principles applied by the OCCA cannot be termed contrary to existing Supreme Court precedent.[1]

Turning to Young's second claim, he argues that the OCCA unreasonably applied Manson in holding that the identification was reliable. Applying the relevant five-factor test from Manson, the OCCA stated:

Robinson testified at trial that while he was talking to his wife on the telephone, he saw two men walk into the Charles Steak House and knew they were not "regulars." He heard a patron yell to keep an eye on those guys. Because he did not know the men, he got off the

_____

[1] The OCCA also held, in the alternative, that the one-man show-up procedure used in this case was not unnecessarily suggestive under Oklahoma law. Id. In support of this decision, the court relied upon Harrolle v. State, 763 P.2d 126, 128 (Okla. Crim. App. 1988), which held that "[a]n on-the-scene confrontation between the victim and the suspect shortly after the commission of the crime may be justified where prompt identification is necessary to determine whether the suspect is the offender or whether police officers should continue their search." Harrolle sets no clear bounds on law enforcement's ability to conduct a pre-arrest, one-person show-up. Yet despite the OCCA's broad view of when a show-up is permitted, Young has identified no "clearly established federal law" that is contrary to Harrolle.

-13-

phone and focused his attention on the men as they walked down the ramp into the gaming room. Robinson was able to describe the skin color, height, and clothing of both men. He also heard the taller man say "All of you SOBs are going to die" as the taller man pulled out his gun. At that point, Robinson ran into the kitchen to escape the gunfire. Within minutes of the shooting, Robinson saw Appellant at the hospital and told officers he recognized the shirt. Although Robinson was unable to identify Appellant at the preliminary hearing, he, as well as other witnesses, testified at trial that Appellant's appearance had changed since the preliminary hearing.

Under these circumstances, Appellant has not shown merely by Robinson's inability to identify him at the preliminary hearing that his in-court identification at trial was unreliable. Robinson's testimony at trial was certain and reflected his degree of attention towards the gunmen was concentrated. We find his in-court identification was not so tainted and unreliable as to have been inadmissible.

Young, 12 P.3d at 34.

These findings are supported by the record. Robinson testified that when the two men first came down the ramp, he observed the men for about three or four seconds as they walked in front of him. He focused on them because they were not regulars, and because he heard someone in the game room say, "Check these two guys out," when the shooters entered. At this time, the area in question was well lit. Later, when Robinson spoke with police and again during the trial, he consistently recalled some of the clothes worn by Young, as well as his hairstyle and general appearance. Very soon after the shooting (estimated to be 45 minutes to an hour later), he was taken to the hospital to attempt an identification. When he first saw Young at the hospital, Robinson did not think

-14-

he was one of the participants. After seeing Young's shirt, however, Robinson identified him as the shorter man. At trial, Robinson again identified the defendant, stating, "My best understanding and recollection of that, it's the same man I seen."

Young directs our attention to some of Robinson's testimony that may properly be termed problematic. It is troubling to this court that Robinson positively identified another individual wholly unconnected with this case as the shorter man during a preliminary hearing. In addition, Robinson was not entirely consistent in describing the clothing worn by Young that evening, and was vague when questioned about what he was told by the police before being taken to the hospital to make the identification. Notwithstanding these inconsistencies, however, Robinson and others testified that Young's appearance was different at the preliminary hearing than when Robinson identified him at the hospital. Further, Robinson testified that his memory was less certain at the preliminary hearing, because such a long time had passed since the incident.

At trial, defense counsel vigorously cross-examined Robinson on all of these points, and attempted to cast doubt on the general accuracy of his recollections. See Belton v. United States, 429 F.2d 933, 934 (10th Cir. 1970) (recognizing that the opportunity for cross-examination alleviates some concerns regarding an in-court identification's reliability). The jury was instructed that "[e]yewitness identifications are to be scrutinized with extreme care. The

-15-

possibility of human error or mistake and the probable likeness or similarity of objects and persons are circumstances that you must consider in weighing testimony as to identity." Although counsel called into question Robinson's credibility, the Court has noted that for these credibility determinations, we must "rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill." Manson, 432 U.S. at 116.

Therefore, based on the record before us, we cannot say the OCCA's decision that the identifications were reliable was objectively unreasonable.[2]

**IV**

Young contends that the evidence presented at trial was insufficient to support his conviction for Murder in the First Degree (malice aforethought). The Supreme Court has held, that in analyzing a sufficiency of the evidence challenge, courts must inquire "whether, after viewing the evidence [contained in the record] in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to

---

[2] We do not reach the question of whether admission of this evidence was harmless error, because we find that there was no error at all.

-16-

ultimate facts." Id.  The question before us is whether the OCCA's application of

the Jackson standard was objectively reasonable.  Torres II, 461 F.3d at 1313.[3]

Oklahoma law defines first degree malice aforethought murder as follows:

A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being.  Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

Okla. Stat. tit. 21, § 701.7(A).  As to intent, we have previously outlined

Oklahoma law on this issue:

First, a jury is permitted to draw inferences of subjective intent from a defendant's objective acts.  Thus, even when a defendant . . . denies having the requisite intent, a jury may disbelieve the defendant if [the defendant's] words and acts in the light of all the circumstances make [the defendant's] explanation seem improbable. Second, a jury is permitted to find that a defendant intends those consequences which he announces a desire to accomplish.

Wingfield v. Massie, 122 F.3d 1329, 1333 (10th Cir. 1997) (quotation and

citations omitted); see also Torres v. Mullin, 317 F.3d 1145, 1153 (10th Cir.

2003).

In rejecting Young's claim that the evidence was insufficient to support a

malice-murder conviction, the OCCA stated:

The question of the sufficiency of the evidence to sustain a conviction is to be determined by examination of the entire record. When the sufficiency of evidence is challenged on appeal, this Court

---

[3] We have previously referred to our standard of review regarding sufficiency challenges under AEDPA as "deference squared."  Id.

-17-

will determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.

. . . .

The evidence, viewed in a light most favorable to the State, shows Appellant entered the restaurant, armed with a gun, with the intent to commit armed robbery, and demanded money. His action in firing his weapon at least four times directly at Joseph Sutton support [sic] the jury's conclusion that he acted with malice aforethought.

Appellant also claims the evidence was insufficient to show identity, based upon his belief that the identification testimony was not reliable and did not conclusively show Appellant committed the shooting. However, we have already determined the identification testimony was properly admitted. The jury properly considered the evidence presented, was appropriately instructed on the use of eye-witness identification testimony, and concluded the State's evidence was sufficient to show Appellant committed the offense.

Although there may be conflict in the testimony, if there is competent evidence to support the jury's finding, this Court will not disturb the verdict on appeal. Review of the entire record reveals sufficient evidence supported the jury's conclusions that Appellant killed Sutton and did so with malice aforethought. We find no merit in this proposition.

Young, 12 P.3d at 35 (quotation and citations omitted).

Because the OCCA applied the correct legal standard, our inquiry is limited to whether its determination that the evidence was sufficient to support the jury's verdict was reasonable. After carefully reviewing the record, we conclude that it was.

Substantial evidence was introduced at trial to show that Young was the

-18-

shorter of the two men who entered the Steak House. Robinson and Ben Griffin testified that they were taken to the hospital within an hour of the incident, where they positively identified Young as the shorter man. An Oklahoma City police officer testified that another individual who did not testify at trial, Roy Rogers, also identified Young as one of the individuals who was there that evening, although Rogers believed Young was the taller man. Robinson also identified Young during the trial as the shorter man, stating, "My best understanding and recollection of that, it's the same man I seen." Mary Long, a criminalist with the Oklahoma State Bureau of Investigation, testified that a DNA test performed on a drop of blood recovered from the scene provided a match to Young's DNA profile. In her estimation, the likelihood that another African-American would have the same DNA profile as that of the sample was approximately one in 5240. The sample was then sent to an outside company, Laboratory Corporation of America, for additional DNA testing. Meghan Clement, a representative from Laboratory Corporation, testified that the DNA contained in the blood drop found at the scene matched Young's DNA. When combined with the test results performed by the Oklahoma Bureau of Investigation, Clement testified, there was a one in 132,000,000 chance that the blood drop would match another African-American.

All witnesses who described the shorter man gave the same general description: A younger-looking, African-American male wearing baggy clothes,

specifically a dark-colored, short-sleeved shirt with various colors or designs on it.[4] When the police observed Young at the hospital, they were told that the crumpled shirt laying at the base of his hospital bed belonged to him. A photo of that shirt reveals it is highly distinctive, bearing a number of designs resembling multicolored stripes of paint.

Other circumstantial evidence linked Young to the crime. Shortly after the shooting, the police were notified that an individual with multiple gun shot wounds was seeking treatment at Presbyterian Hospital, located a short distance from the Steak House. When they arrived and questioned him at the hospital, Young gave the officers a false name and birth date. Young told one officer that he was from Nashville, Tennessee, and took a bus to the hospital. He told another that he did not recall how he arrived at the hospital, and that he was from out of town. It is undisputed that there were no public buses running at that time – rather, the last stopped at 7:15 p.m. There is also no dispute that at the time Young made these statements he was not under the influence of pain medication.

---

[4] Of the identifying witnesses, only one provided an inconsistent description of the shooter's clothing. Quintin Battle testified that the shorter shooter was wearing a cap, a tan coat, and street clothes. Battle also testified, however, that he had only a glimpse of the gunman out of the corner of his eye as the gunman exited the Steak House, that he could not see the shooters when they first entered the game room, and that it was hard for him to remember details because the event had occurred over two years before he testified. Thus, the jury must have chosen to reject Battle's testimony regarding what the shooter was wearing in favor of the three other witnesses who provided consistent accounts of the shorter man's clothing.

Although no witness actually observed Young pull the trigger and fire upon Sutton, Battle, who was closest to the shorter man and the victim when the shooting began, testified that the shorter man walked over to the restroom area, raised a revolver in the air, and stated "[w]e come for the money" and "don't move"[5] – language that Battle took as threatening. After hearing those commands, Battle turned his back to the shooter and looked toward the victim. Sutton then pulled something out of his pocket and threw it on the floor. Immediately thereafter, Sutton reached in another pocket, pulled out a .380 caliber semi-automatic pistol, aimed it at the shorter man, and pulled the trigger. Battle fell to the floor, and heard a click, but did not hear a bullet fire. Sutton racked his pistol's slide to load a bullet into the chamber. At this point, Battle, who was still laying on the ground, heard shots fired back and forth. Because he had turned his back to the shooter, Battle testified that he did not know if the shooter had lowered his weapon and pointed it at either him or Sutton before Sutton drew his gun. After the shots ceased, Battle witnessed the shooter leave. Sutton, he observed, was laying on the floor.

The day following the shooting, police received a call from someone who lived approximately two blocks from Presbyterian Hospital. She testified that late that evening she heard a sound outside of something being dropped into her

---

[5] Griffin also testified that the shorter man brandished a small revolver.

garbage can. Looking out the window, she saw an African-American man in a vehicle pulling away from the curb. The next morning she found a .38 caliber Smith and Wesson revolver in her garbage can. Gordon Robertson, a senior firearms examiner for the Oklahoma City Police Department, testified that he tested the two firearms linked to the shooting (Sutton's .380 caliber semi-automatic pistol and the .38 caliber Smith and Wesson recovered from the trash can) and the bullets recovered from scene, and reached the following conclusions: (1) Four projectiles were definitively identified as being fired from the semi-automatic; (2) Three projectiles were so damaged that he could not perform any comparisons; (3) Three projectiles were consistent with being fired from a single firearm, but that firearm had not been recovered; (4) Three projectiles, including the fatal bullet retrieved from the victim, had characteristics consistent with being fired from the Smith and Wesson, although he could not conclusively link them to that gun.

As to intent, evidence shows that Young entered the Steak House with a fully loaded revolver. He walked to the restroom area, made a threatening statement, and fired his gun toward Sutton. Robinson testified that it sounded like several guns were being fired, and that he heard approximately 15-20 shots. Edwards testified that he heard "way more" than two to four shots fired from behind him. Dr. Chai Choi, a forensic pathologist who performed the autopsy on Sutton, testified that Sutton was shot four times. The fatal wound, Dr. Choi

testified, entered Sutton in the back of his body. Moreover, all of Sutton's wounds had a downward trajectory, indicating that the shots were fired by a standing shooter.

Finally, the evidence showed that Young removed the bullet from his back in order to avoid turning it over to the State. Dr. Jerry Childs, who examined Young when he sought medical attention the night of the incident, testified that he was treated for three gunshot wounds. One of the bullets was lodged just under Young's skin in the area below his left shoulder blade, and was not removed. Dr. Charles Harvey, a physician employed at the Oklahoma County Jail, testified that Young came to see him complaining about the bullet. Although Dr. Harvey scheduled a surgery to remove the bullet one week later, Young never returned or followed up. Later, a judge granted the government's motion to require Young to undergo an examination to see if the bullet lodged in his back could be removed. When Young appeared for his examination the bullet was gone. Dr. Mason Jett, who examined Young, testified there was a relatively fresh wound where the bullet should have been. Both Dr. Jett and Dr. Childs testified that it was extremely unlikely the bullet could have worked its way out naturally.

Young makes two arguments as to why this evidence is insufficient to sustain his conviction. First, he claims that the identification evidence is unreliable and should not have been admitted. As we held supra, however, Robinson's in-court identification of the defendant was admissible, and Young

-23-

does not challenge the extrajudicial identifications made by Griffin and Rogers.

Second, Young contends that the evidence was insufficient because two witnesses, Griffin and Robinson, testified that they never heard or saw the shorter man do or say anything during the shooting. However, Griffin testified that he ran out the door immediately after the shots were fired. Robinson testified that as soon as he saw Edwards grab the tall man's gun, he fled. Neither of these individuals were in the immediate vicinity of Young after he moved near the restroom door and out of sight.

Accordingly, we conclude that there was sufficient evidence that a rational jury could find Young guilty of first degree murder with malice aforethought.[6]

**V**

---

[6] At trial, the prosecution argued in the alternative that even if Young was not the shooter, but merely a participant in the armed robbery, he was guilty under Oklahoma law as an aider and abettor of the murder. Under Oklahoma's criminal code, any person who aids or abets the commission of a murder is considered a principal of the crime. Okla. Stat. tit. 21, § 172. The OCCA has specified that in order to sustain a conviction of Murder in the First Degree under an aider and abettor theory, the government "must prove: (1) that the defendant personally intended the death of the victim; and (2) that the defendant aided and abetted with full knowledge of the perpetrator's intent." Spears, 343 F.3d at 1238 (citing Wingfield, 122 F.3d at 1332). The trial court instructed the jury regarding Oklahoma's aiding and abetting law. On appeal, Young contends that the evidence is insufficient to establish he had the requisite intent as an aider and abettor to be convicted of first degree murder, citing our prior decision in Sanders/Miller v. Logan, 710 F.2d 645 (10th Cir. 1983). We need not reach this issue, however, because we are satisfied that a reasonable jury could, based on the evidence before it, conclude Young shot Sutton with the intent to kill.

-24-

Young's third claim is that the OCCA's decision that Young was not entitled to an instruction on the lesser included offenses of second degree murder and first degree manslaughter was in violation of clearly established federal law. On collateral attack, we review a state court's determination that the evidence did not support a lesser-included-offense instruction to determine whether it was unreasonable.  See Valdez v. Ward, 219 F.3d 1222, 1242 (10th Cir. 2000).

In Beck v. Alabama, 447 U.S. 625 (1980), the Court made "clear that state rules barring properly supported lesser included offense instructions in a capital case are constitutionally impermissible because such rules 'diminish the reliability of the guilt determination' and 'enhance the risk of an unwarranted conviction.'" Id. at 638 (alteration omitted).  The Court held "a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict."  Id. at 627.  However, "[a] petitioner is required to establish not only the denial of a lesser included offense instruction, but also that he presented sufficient evidence to warrant such an instruction."  Hogan v. Gibson, 197 F.3d 1297, 1306 (10th Cir. 1999) (citing Beck, 447 U.S. at 637).  To succeed on a claim under Beck, a petitioner must show that the evidence presented at trial would permit a rational jury to find him guilty of the lesser included offense and acquit him of first degree murder.  Hogan, 197 F.3d at 1307.  Oklahoma has held

that all lesser forms of homicide are considered lesser included offenses of first degree murder. Shrum v. State, 991 P.2d 1032, 1036 (Okla. Crim. App. 1999).

At trial, Young presented two defense theories that, in his view of the record, would permit a rational jury to convict him of a lesser included offense. He first argues that a jury could conclude he was at the Steak House, but did not shoot anyone or fire his weapon, which would support a conviction for Murder in the Second Degree (depraved mind). In the alternative, he argues a jury could find that he engaged in a gun battle with Sutton, but only did so because Sutton first drew a gun on him, causing the robbery to spin out of control. That theory could support a conviction for First Degree Manslaughter.[7] The district court denied his requests for lesser included offense instructions, and the OCCA affirmed. We conclude that the OCCA's decision on this issue was not contrary to, or an unreasonable application of, clearly established federal law.

## A

Young contends he is entitled to an instruction on Murder in the Second Degree (depraved mind) because a rational jury could conclude, based on the evidence presented at trial, that the taller man fired the shot that killed Sutton. Oklahoma law permits a conviction of First Degree Murder (aider and abettor)

_____

[7] Young also argued that he was not at the Steak House that evening, but was the victim of a random shooting near a 7-11 convenience store and an Autozone. If the jury credited this version of events, of course, it could not have convicted him of any lesser included offense.

even if another shooter fired the fatal shot, so long as Young also fired bullets at the victim. See Spears, 343 F.3d at 1238-39. Young contends that a rational jury could conclude that he was not a participant in the shooting at all, however, but fled the scene.

The elements of second degree depraved mind murder under Oklahoma law are (1) a death, (2) caused by conduct that was imminently dangerous to another person, (3) the conduct was that of the defendant, (4) the conduct evinced a depraved mind in extreme disregard of human life, and (5) the conduct is not done with the intention of taking the life or harming any particular individual. Okla. Stat. tit. 21, § 701.8(1); Phillips v. State, 989 P.2d 1017, 1034 (Okla. Crim. App. 1999).

Recognizing that the relevant inquiry under Beck is whether the evidence supported a conviction for a non-capital offense, see Young, 12 P.3d at 38-39, the OCCA concluded that the evidence did not support a second degree depraved mind murder instruction because there was no evidence Young did not intend to kill Sutton during the robbery:

> [W]e find Appellant was also not entitled to instructions on second degree depraved mind murder. While we would concede Appellant's imminently dangerous conduct caused the death of Joe Sutton, we simply cannot interpret the evidence to show he committed such conduct without a particularized intent. A design to effect death [i.e., premeditation] is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed. Premeditation sufficient to constitute murder may be formed in an instant. Malice aforethought may be proved by circumstantial

-27-

evidence.

> Appellant entered the business with the intent to rob its occupants with the use of a deadly weapon. He stood directly in front of Joe Sutton, raised his weapon, and demanded money. He fired upon Sutton when Sutton tried unsuccessfully to defend himself. The physical evidence showed the gunshot wound that killed Sutton entered through the right side of the back of his chest. Malice can be inferred from these facts and the evidence did not require an instruction on depraved mind second degree murder.

Id. at 39-40 (citations and quotations omitted) (alteration in original). Thus, the OCCA concluded that the evidence did not support Young's theory that he was not involved in the shooting.

During the trial, Battle, the individual closest to the shorter man and the victim, testified that once Sutton drew his weapon he heard shots fired between the shorter man and the victim. He further testified that only after the shooting stopped did he see the shorter man leave the area. It is undisputed that all of Young's injuries were front-entry wounds, indicating that he was facing Sutton as shots were exchanged. Those wounds simply cannot be reconciled with Young's theory that he attempted to flee as soon as shots were fired, in which case some of the bullets that struck him would have entered from the rear or the side. In addition, forensic evidence revealed that there were at least three weapons used during the gunfight, and there was no evidence of shots fired by anyone but Sutton and the two robbers. Therefore, Young must have fired his weapon before fleeing. The Smith and Wesson revolver, which circumstantial evidence linked to

-28-

the robbery, contained six spent shell casings.

Young cites the following evidence in the record in support of his theory that he fled without firing, and lacked any intent to kill: (1) Edwards, who was struggling with the taller man, testified that the taller man called out to the shorter man for help, but the shorter man refused to provide it; and (2) Bullets from Sutton's gun were found in the far wall, indicating that Sutton fired shots towards the exit. As to the first point, the evidence is undisputed that the shorter man had already been shot three times before the taller man requested assistance. As to Young's second point, the fact that bullets from Sutton's gun were recovered from the far wall undoubtedly cuts in his favor. Yet in light of the undisputed evidence that the shorter man engaged in the gun battle, we are foreclosed from concluding it was unreasonable for the OCCA to hold that a rational jury could not find Young's flight theory credible.

**B**

Young argues that he was constitutionally entitled to an instruction on first degree manslaughter because, based on the evidence before it, a rational jury could conclude that the robbery spun out of control, Sutton fired the first shot, and then Young tried to defend himself. Homicide is Manslaughter in the First Degree when "perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon . . . ." Okla. Stat. tit. 21, § 711(2); Brown v. State, 777 P.2d 1355, 1357 (Okla.

-29-

Crim. App. 1989). First degree manslaughter may also occur when a homicide is "perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed." § 711(3).[8] Under Oklahoma law, the evidence must be such that a rational jury could find that the defendant did not intend to kill the victim in order for a jury to convict a defendant of first degree manslaughter. Hogan, 197 F.3d at 1307 ("Heat of passion and the lack of design to effect death are related requirements: The heat of passion must render the mind incapable of forming a design to effect death before the defense of manslaughter is established.") (quotations omitted); see also Mitchell, 262 F.3d at 1049-1051.

Again, the OCCA held that no rational jury could convict Young of first degree manslaughter because the evidence could only support a finding that Young intended to kill Sutton:

> Appellant claims sufficient evidence was presented to support instructions on first degree heat-of-passion manslaughter, because it showed he fired on Sutton out of fear after Sutton "drew and fired, or at least attempted to fire." Appellant argues his shooting of Sutton was triggered by his fear and therefore supported an instruction on heat-of-passion manslaughter. He claims an instruction on manslaughter by resisting criminal attempt was also warranted by the evidence showing he shot Sutton to keep Sutton from shooting him.

---

[8] Although no cases have interpreted this provision of Oklahoma's manslaughter statute, the Committee Comments contained in the Oklahoma Uniform Jury Instructions make clear that the provision is only applicable when the "defendant did not initiate the difficulty." Oklahoma Uniform Jury Instructions Crim. 2d 4-102 cmt.

We disagree with Appellant's description of the evidence. By all accounts, Appellant and his co-intruder instigated the whole incident when they entered the Charles Steak House with the intent to commit robbery; they were armed, made threats, and demanded money. Things went amiss when Appellant's intended robbery victim tried to thwart the robbery and defend himself with his own weapon. Sutton's weapon, however, did not fire and Appellant fired at him. The medical examiner testified the four gunshot wounds to Sutton's body were in a right to left and downward trajectory, and the gunshot wound which caused Sutton's death entered the back of his chest. The medical examiner also testified the exit wound of the number two bullet demonstrated Sutton's body was up against something hard which kept it from exiting. The physical evidence suggests Appellant continued to shoot Sutton after he had fallen to the ground.

. . . .

Here, the circumstances surrounding the shooting clearly show Appellant and his cohort planned and instigated the entire deadly situation. Further, the evidence suggests Appellant shot Sutton while Sutton was on the ground. He was not entitled to instructions on a reduced degree of homicide simply because an intended victim chose to defend himself.

Young, 12 P.3d at 39.

To the extent Young challenges the OCCA's holding that, under Oklahoma law, an individual who provokes an attack by the victim and then shoots the victim cannot be convicted of first degree manslaughter, Oklahoma's interpretation of state law is binding on this court, and thus unreviewable. Chapman v. LeMaster, 302 F.3d 1189, 1196 (10th Cir. 2002) ("On habeas review, the [state] court's interpretation of the state . . . statute is a matter of state law binding on this court.").

To the extent Young challenges as unreasonable the OCCA's factual

finding that a rational jury could not conclude, based on the evidence before it, that Sutton fired at Young unprovoked, we disagree. All of the evidence introduced at trial indicated that even if Sutton drew his firearm before Young shot him, Young provoked the violent encounter. Young entered the Steak House with a loaded firearm, demanded money while raising his gun in the air, and shot Sutton multiple times when Sutton attempted to defend himself.

Young cites Hogan for the proposition that he was entitled to a first degree manslaughter instruction. In Hogan, evidence showed that the victim and defendant began arguing, during which confrontation the victim ran into the kitchen, grabbed a kitchen knife, and began swinging it at the defendant. 197 F.3d at 1301. Defendant seized the knife, chased the victim as she ran away, and stabbed her repeatedly. Id. Shortly after the incident, defendant confessed, describing the encounter as follows: "[I]t wasn't . . . it was like I wasn't even there . . . just somebody else . . . it wasn't even me . . . It was stabbing her and I couldn't stop him." Id. at 1302. The trial court found that Hogan was not entitled to a first degree manslaughter instruction under Beck, and the OCCA affirmed. We granted habeas relief.

Initially, we recognized that under Oklahoma law, "a defendant is entitled to a manslaughter instruction only if the evidence at trial would allow a jury to rationally conclude the defendant's rage rendered him or her incapable of forming a design to effect death." Id. at 1308 (citing Allen v. State, 821 P.2d 371, 374

-32-

(Okla. Crim. App. 1991)).  We also noted that under Oklahoma law, "homicide in response to a victim's unprovoked attack with a dangerous weapon may constitute first-degree manslaughter."  Id. (citations omitted).  Based on our review of the record, we concluded there was evidence presented at trial from which a reasonable jury could conclude that Hogan did not provoke the encounter, or that Hogan was acting under the heat of passion to a degree that precluded him from forming an intent to kill.  Id. at 1309.

By contrast, in this case no evidence was introduced in support of Young's theory that he did not intend to kill Sutton.  Young provided no alternative version of events to the jury, either via his own testimony or other evidence.  No expert testified that an individual with Young's characteristics or background was likely unable, as a matter of temperament, to form an intent kill.  Moreover, none of the multiple witnesses who testified to the events surrounding the gun battle testified that Young appeared to be acting in the heat of passion when he shot Sutton.  Rather, a rational jury could only conclude that either (1) Young acted with a preformed intent to kill Sutton even before Sutton drew his gun, or (2) Young shot Sutton after Sutton drew his gun with the intent to kill or wound him before Sutton could fire back.

Accordingly, the OCCA's decision that Young was not entitled to a jury instruction on first degree manslaughter was not unreasonable.

Young next argues that trial counsel was ineffective in failing to introduce testimony from a crime scene reconstructionist suggesting that the taller man fired the fatal shot. He also contends that appellate counsel was ineffective in failing to raise trial counsel's ineffectiveness on appeal. Young raised this claim for the first time during post-conviction proceedings before the OCCA. Because the OCCA applied a legal principle that is contrary to clearly established federal law in evaluating Young's ineffective assistance claim[9] – as the state concedes – no deference is given to the OCCA's decision under 28 U.S.C. § 2254(d). Thus, the district court properly reviewed this claim de novo. See Spears, 343 F.3d at 1248. Under these circumstances, "[w]e review the district court's legal conclusions de novo and its factual findings, if any, for clear error." Id. at 1225.

Ineffective assistance claims are reviewed under the framework set forth by the Court in Strickland v. Washington. To prove ineffective assistance of counsel at either the trial or appellate stage, a defendant must show, by a preponderance of the evidence, that (1) counsel's performance fell below an objective standard of reasonableness, and (2) prejudice, such that there is a reasonable probability

---

[9] The OCCA relied on Walker v. State, 933 P.2d 327, 332 (Okla. Crim. App. 1997). In Cargle v. Mullin, 317 F.3d 1196, 1205 (10th Cir. 2003), we held that the Walker test does not comport with clearly established federal law on this issue, namely the Supreme Court's holding in Strickland v. Washington, 466 U.S. 668 (1984).

-34-

that but for counsel's errors, the outcome of the trial would have been different. Strickland, 466 U.S. at 688, 692-93.

Young argues that counsel's representation fell below an objectively reasonable standard because he did not secure a crime scene reconstructionist to testify that the fatal shots were likely fired by the taller man. During an evidentiary hearing before the district court, Edward Hueske, an expert in crime scene reconstruction, testified (Hueske had previously submitted a written report to the OCCA during Young's state collateral appeal). His review of the forensic evidence led him to conclude: (1) There was no evidence to substantiate a theory that the taller man fired all of his shots into the ceiling; (2) He would have had no problem testifying to that effect at the time of Young's trial; (3) At least three weapons were fired during the incident; (4) At least 17 shots were fired; (5) Six lead bullets were recovered – two from the deceased and four from the scene; and (6) The location of the other lead bullets suggests that the taller man fired the fatal lead bullets.

We need not decide whether counsel was constitutionally ineffective in failing to hire the services of a crime scene investigator, however, because Young has failed to prove that he was prejudiced by omission of this evidence, such that there is a reasonable probability of a different outcome at trial.[10] "A reasonable

_____

[10] Counsel's primary defense theory was that Young was not at the Steak

(continued...)

-35-

probability is a probability sufficient to undermine confidence in the outcome."

Strickland, 466 U.S. at 694. The touchstone of this inquiry is whether "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id.

Hueske's report and testimony have little probative value. As the OCCA concluded on collateral appeal, the report primarily establishes that the police could have done a more thorough job in analyzing and recording details about the crime scene. The report lists a variety of steps police could have taken to establish a more accurate picture of the crime through the forensic evidence. Yet Hueske conceded at the evidentiary hearing that because police did not develop "bullet trajectories for the bullet holes that were in the various walls," he was left with "the very limited capability of what [he] could do." Hueske continued:

> Basically all I could do is look at different descriptions of the bullets and try to look for some sort of general pattern. And then, based on that, I could then come up with some suggested scenarios. That's the best that I could do under the constraints of the lack of

---

[10](...continued)
House that evening. In support of that theory, he presented four witnesses to bolster Young's claim that he was the victim of a random shooting elsewhere. It is unclear whether counsel's failure to present evidence in support of an alternate theory is necessarily ineffective. See, e.g., Davis v. Terry, 465 F.3d 1249, 1255-56 (11th Cir. 2006) (holding counsel was not ineffective in failing to investigate other potential evidence, when counsel was fully prepared for trial and presented a valid defense of mistaken identity). We need not reach this issue, however, because counsel also vigorously cross-examined the state's witnesses about their ability to identify Young, and not the taller man, as the shooter.

documentation.

He conceded that the crime scene was "lacking significantly in the things that would be required to carry out a shooting reconstruction."

Beyond these general limitations in his ability to accurately reconstruct the crime scene, he also testified that his limited opinions were contingent on the assumption that the fragments and other forensic evidence were "in fact in the location that they originally were following the shooting." The evidence is undisputed that multiple individuals entered the crime scene before police could secure the area. During cross-examination Hueske testified that he was also required to assume for purposes of his analysis that the taller man's gun was loaded with a single type of ammunition, despite the possibility that an assailant might have multiple types of ammunition in his firearm. When questioned further about whether certain projectiles were fired from the taller man's firearm, Hueske stated, "I would have no way of knowing, so I can't really address that. . . . [A]nything is possible, because I have no direct knowledge of what the evidence is." He stated in his report that "neither of the two intruders can be either identified or excluded as having fired the fatal shots into the decedent." In the same report he admitted that the Smith and Wesson revolver found near the hospital could have fired the fatal shot, but could reach no conclusion from the forensic evidence on who fired that revolver.

Although he testified during the evidentiary hearing that there was no direct

evidence as to which shooter carried the Smith and Wesson revolver, uncontradicted testimony established that the shorter man was holding a small revolver, and the taller man was holding a long-barreled revolver. Hueske corroborated the state's theory that the shorter man fired the fatal shots, stating that the nature of the fatal wounds indicated the shooter was standing and fired at a downward angle. Most importantly, Hueske conceded that "a real crime scene reconstruction isn't an option" in this case, and would not have been available to Young's counsel when he was investigating potential defense theories. In sum, even if we were to exclude all possible inferences from the Hueske report and testimony that might damage Young's case, and take as true those statements that could be deemed exculpatory, the only favorable inference to be drawn from Hueske's statements is that the taller man likely fired at Sutton, and those shots may have been fatal.

Yet even if we were to assume a jury might agree with Hueske's conclusions on that point, the government's case did not hinge on the jury finding that the taller man did not shoot Sutton. Edwards testified that while he was wrestling on the ground with the taller man, he tried to force the man's wrist upward each time the man tried to fire a shot. Contrary to Young's argument on appeal, the prosecutor did not attempt to use this evidence to show that Young must have fired the fatal shot, because Edwards in fact forced the taller man's bullets into the ceiling. Instead, the state argued that the evidence showed that

-38-

Young walked into a crowded room with a loaded weapon, assumed a position by the wall, raised his gun into the air, and demanded money. When Sutton drew a weapon to defend himself, witness testimony established that the two men began firing at each other. Only when the shots ended did Young try to leave the area. Forensic evidence established that the small revolver found near the hospital where Young sought treatment could have fired the bullets that killed the victim. Even if it was a bullet from the taller man's gun that killed Sutton, the state argued, the evidence established that Young was guilty under an aider and abettor theory because he fired some shots at the victim, and thus had the intent to kill.

Petitioner cites Moffett v. Kolb, 930 F.2d 1156, 1160-61 (7th Cir. 1991), apparently for the proposition that an attorney's failure to present evidence that another individual was the shooter is always prejudicial. In that case, the attorney failed to introduce evidence that a witness to the shooting made statements that a third party, not the defendant, had fired the gun at the victim. Id. at 1161. Because there was no direct evidence linking the defendant to the shooting, the court held that counsel's failure to present testimony directly contradicting the prosecution's theory of which man was the shooter was prejudicial, when that evidence was exculpatory. Id. Here, by comparison, Young was not prejudiced by the exclusion of Hueske's report or testimony, because none of the conclusions Hueske draws from the forensic evidence contradicts the most critical aspect of the government's case – that notwithstanding who or what was struck by bullets

-39-

from the taller man's gun, Young also fired at Sutton with the intent to kill.

Like the district court, we conclude that because of the nature of the evidence relied upon by the state to establish that Young may have fired the fatal shot, testimony by a crime scene reconstructionist could not have affected the outcome of the trial. Because Young has not carried his burden under the second prong of Strickland to prove trial counsel's alleged failures prejudiced his defense, we need not reach the issue of whether counsel on appeal was ineffective for failing to raise an ineffective assistance claim. See Jones v. Gibson, 206 F.3d 946, 959 (10th Cir. 2000).

## VII

Finally, Young claims that trial counsel was constitutionally ineffective during the penalty stage for failing to present mitigation evidence on the environmental, cultural, and societal impact of growing up in south-central Los Angeles, California. We apply a heightened standard of scrutiny when evaluating the performance of attorneys during a capital sentencing hearing. Cooks v. Ward, 165 F.3d 1283, 1294 (10th Cir. 1998).

As an initial matter, the parties dispute whether the district court had license to hold an evidentiary hearing on this issue, in light of the OCCA's adjudication of this claim on the merits. Unlike his ineffective assistance claim with respect to the guilt phase of the trial, Young argues that counsel was ineffective for failing to present mitigation evidence on direct appeal. In support

of his claim, he submitted a motion pursuant to OCCA Rule 3.11(B)(3)(b) to the OCCA for an evidentiary hearing. Young attached to this motion a variety of materials intended to support his claim that the mitigation evidence presented at the guilt phase was so inadequate as to constitute ineffective assistance.

Describing those materials in turn, Young first attached an affidavit by John Floyd, an investigator with the Oklahoma County Public Defender's Office, outlining the prevalence of death and violence in Young's childhood environment, and noting that Young's family was peripatetic when he was growing up. Second, Young attached a paper titled <u>African American Males and Capital Murder: A Death Penalty Mitigation Strategy</u>, by James H. Johnson, Jr., Walter C. Farrell, Jr., and Marty Sapp – all of whom have served as defense expert witnesses in capital cases. That paper argues that because of the trials of growing up in the gang- and poverty-ridden environs of "south central" Los Angeles, murderers from that community should reasonably be given a life sentence without parole as opposed to the death penalty. Third, Young submitted an affidavit by Chuck Loughlin, an investigator with the Oklahoma County Public Defender's Office, attesting that during his interviews with jurors following the trial, they indicated that Young's lack of remorse as well as their limited knowledge of his past affected their decision to impose the death penalty. Fourth and finally, Young attached an affidavit by James H. Johnson, Jr., attesting that Young's penalty phase defense was "inadequate, largely because it failed to address impacts –

singularly or in concert" – of factors in Young's life. The factors Johnson listed were: (1) the lack of warmth or emotional support from Young's biological parents during his formative years, (2) his unstable family situation and time spent in south-central Los Angeles, (3) his "chronic residential mobility," and (4) Young's lack of any psychological counseling to deal with his many mental health issues.

The OCCA denied his motion for an evidentiary hearing. On direct appeal, the OCCA stated:

> Appellant argues he was denied effective assistance of counsel during the second stage of trial as a result of counsel's failure to present mitigation evidence. To successfully prove ineffective assistance of counsel, Appellant must show: (1) that defense counsel's performance was deficient; and (2) that he was prejudiced by the deficient performance. Failure to prove either of these elements is fatal to Appellant's entire claim.
>
> Young argues trial counsel was ineffective for failing to present mitigating evidence, and specifically for failing to seek out and present available evidence relating to the social impact on the physical, mental, emotional, and moral development of children raised in inner-city ghettos. Young attempts to support this claim by referring to extra-record material filed in support of his Motion for Evidentiary Hearing on Sixth Amendment Claims. Therein, Appellant requested an evidentiary hearing pursuant to Rule 3.11(B)(3)(b)(i), Rules of the Oklahoma Court of Criminal Appeals.
>
> Rule 3.11(B)(3)(b)(i) allows an appellant to request an evidentiary hearing when it is alleged on appeal that trial counsel was ineffective for failing "to utilize available evidence which could have been made available during the course of the trial . . . ." Once an application has been properly submitted along with supporting affidavits, this Court reviews the application to see if it contains "sufficient evidence to show this Court by clear and convincing evidence there

is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence."

In support of his application, Appellant offered the affidavits of two investigators, an affidavit and Curriculum Vitae from James H. Johnson, Jr., Ph.D., and an essay or paper authored by Dr. Johnson. One investigator's affidavit focuses on Appellant's family and social history. The other investigator's affidavit suggests several jurors felt there was little information about Appellant's past and they did not perceive any remorse on Appellant's part. Dr. Johnson's essay focused on the criminal behavior of young African American males raised in the inner city, specifically Los Angeles, California, and emphasized the need to evaluate that behavior based upon the broader family, community and social contexts.

Review of the application and the supporting affidavits shows trial counsel could well have utilized this evidence and it may have been prudent for him to do so. However, Appellant has not shown by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to utilize or identify this evidence. The jurors were in fact presented with evidence concerning Appellant's social background and family history through the testimony of his sister, although the evidence was not presented in the same context it would have been if presented by the learned Dr. Johnson. We do not believe the extra-record material establishes by clear and convincing evidence that trial counsel was ineffective for not presenting this mitigation evidence through Dr. Johnson. Accordingly, this proposition of error and Appellant's Motion for Evidentiary Hearing on Sixth Amendment Claims are denied.

Young, 12 P.3d at 44-45 (citations and footnotes omitted).

Young then moved for an evidentiary hearing in federal district court to further substantiate his allegations that counsel was ineffective by failing to investigate and present mitigation evidence. 28 U.S.C. § 2254(e)(2) prohibits a federal district court from conducting an evidentiary hearing on a habeas claim that petitioner failed to develop in state court. However, "[i]f . . . the petitioner

-43-

did not fail to develop the factual basis of his claim in State court, § 2254(e)(2) is not applicable and a federal habeas court should proceed to analyze whether a hearing is appropriate or required under pre-AEDPA standards." Bryan, 335 F.3d at 1214 (quotations, citations, and alterations omitted). A petitioner does not fail to develop his claim "unless there is a lack of diligence, or some greater fault" on his or her part. Williams v. Taylor, 529 U.S. 420, 432 (2000). Under pre-AEDPA standards, a "[p]etitioner is entitled to an evidentiary hearing on the issue of ineffective . . . counsel so long as his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief." Hammon v. Ward, 466 F.3d 919, 927 (10th Cir. 2006) (quotation omitted).

The district court determined that Young diligently sought an evidentiary hearing in state court, and thus could not be deemed to have "failed to develop the factual basis" of the ineffective assistance claim. It then assessed whether Young satisfied the second prong of the inquiry, such that he would be entitled to relief. The court stated, "[a]lthough Petitioner might normally satisfy the above standard, the Court does not find an evidentiary hearing is warranted under the circumstances." It reached this conclusion because Young had filed affidavits supporting his allegations of ineffective assistance of counsel from family members and his living trial counsel[11], and failed to give "any explanation or

_____

[11] Young's lead trial counsel, Barry Albert, died between the conclusion of
(continued...)

-44-

indication of additional information or evidence he anticipates would be provided in an evidentiary hearing." Instead, the court chose to exercise its discretionary authority under 28 U.S.C. § 2246 to expand the record to include the submitted affidavits and materials. When the state objected to this approach on numerous grounds, the district court reversed course and granted Young's motion for an evidentiary hearing. Despite the court's belated decision to grant a hearing, neither of the court's orders reach the question of whether Young's allegations, if true, would entitle him to relief on the merits of his ineffective assistance claim.

In this case, Young diligently sought to develop the factual basis for his ineffective assistance claim, and submitted affidavits substantiating his allegations to the OCCA. Thus, the district court was permitted to hold an evidentiary hearing only if Young's "allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief." Hammon, 466 F.3d at 927.

Because the OCCA decided this claim on the merits, Young would ordinarily be entitled to habeas relief only if he could show that the OCCA decision was contrary to, or an unreasonable application of, clearly established federal law, or rested on an unreasonable determination of the facts. Spears, 343 F.3d at 1225. However, if the OCCA used the wrong standard in evaluating

[11](...continued)
his direct appeal and his pursuit of collateral relief from the OCCA.

Young's claim, the district court owed the OCCA no deference and properly conducted an evidentiary hearing on this matter. Id. at 1248.

As noted above, the well-settled standard for proving ineffective assistance of counsel requires a petitioner to show, by a preponderance of the evidence, that (1) counsel's performance fell below an objective standard of reasonableness, and (2) prejudice, such that there is a reasonable probability that but for counsel's errors, the outcome of the trial would have been different. Strickland, 466 U.S. at 688, 693-94. When petitioner challenges counsel's conduct during the sentencing phase of the trial, petitioner must show "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Battenfield v. Gibson, 236 F.3d 1215, 1234 (10th Cir. 2001).

The OCCA did not apply the Strickland test, however, but instead required Young to show prejudice by "clear and convincing evidence." Young, 12 P.3d at 44-45. The district court was thus correct to hold an evidentiary hearing, and review the claim de novo. Nevertheless, we conclude that the record, including the evidence proffered at the evidentiary hearing, does not support an inference of counsel's constitutional ineffectiveness during mitigation.

Our "principal concern" in assessing defense counsel's performance, moreover, is "not whether counsel should have presented a mitigation case," but "whether the investigation supporting counsel's decision not to introduce

-46-

mitigating evidence . . . <u>was itself reasonable</u>." <u>Wiggins v. Smith</u>, 539 U.S. 510, 522-23 (2003). Counsel's failure to perform any investigation into the defendant's background to seek out relevant information is not a strategic decision afforded deference, and can constitute ineffective assistance of counsel. <u>See, e.g.</u>, <u>id.</u> at 524 (holding that to perform effectively at the mitigation stage of a capital case, counsel must attempt "to discover <u>all reasonably available</u> mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor") (citation omitted); <u>Williams v. Taylor</u>, 529 U.S. 362, 396-97 (2000); <u>Anderson v. Sirmons</u>, 476 F.3d 1131, 1145-46 (10th Cir. 2007) (collecting cases holding that counsel's failure to perform an adequate investigation into a defendant's background, without any strategic basis for doing so, constitutes ineffective assistance of counsel). It is equally clear, however, that "counsel need not interview every possible witness to have performed proficiently." <u>Owens v. United States</u>, ___ F.3d ___, 2007 WL 1083136, at *14 (1st Cir. 2007) (quoting <u>Riley v. Payne</u>, 352 F.3d 1313, 1318 (9th Cir. 2003); <u>see also</u> <u>Lema v. United States</u>, 987 F.2d 48, 55 (1st Cir. 1993).

Young contends that his counsel's investigation of potentially mitigating evidence was constitutionally insufficient. Specifically, Young argues that his counsel did not adequately investigate his childhood and adolescent experiences with violence and gang activity. The strongest evidence in support of this claim is that there is nothing regarding mitigation in Young's file, and, in particular, no

comprehensive social history on the petitioner.

The district court rejected this claim. Although Young is correct that many documents that should be in his file have gone missing (a problem that is exacerbated by the fact that his lead counsel, Albert, is now deceased), the district court found that both circumstantial and direct evidence established counsel had conducted some investigation into Young's background and was aware of this information. Counsel filed motions before the trial court seeking to limit any references to Young's gang history, and objected at trial to testimony including any such references. Young's counsel also submitted a witness list identifying three witnesses who shared Young's background, all of whom would testify that Young was a good person until he became involved with a set of Los Angeles gangs, as well as other evidence suggesting Young would not pose a danger to society in a structured prison environment.[12] Counsel also obtained a psychological evaluation for Young from Dr. Murphy, who testified at trial.

In addition, there is circumstantial evidence that counsel did more than a cursory investigation into Young's history. John Floyd, an investigator in the Oklahoma County Public Defender's office, testified that Albert performed his own mitigation work, and that as an experienced attorney, he was fully capable of performing mitigation work. Both Floyd and Vincent Antonioli (an attorney who

_____

[12] For reasons that are not clear from the record, only one of the listed witnesses, Young's sister Linda McZeal, testified.

-48-

assisted Albert during trial) testified that at the time of the trial Albert had been practicing law for over 20 years, had a good reputation in the community, and had received numerous awards for his abilities.

Antonioli testified that he did not recall any investigator being involved in the case during the second stage of the trial, and further did not have any recollection as to what evidence was obtained regarding mitigation. He did recall speaking with Linda McZeal the day before her testimony. He also recalled that he was aware of Young's involvement with gangs in California. Further, he saw some indication in the file that Albert had discussed mitigation with Young prior to the second-stage proceedings. He testified that, in his experience, the "idea of a poor family background, including abuse and exposure to violence" is the sort of thing that he would bring to a jury's attention during the penalty stage. However, he conceded that, in light of evidence that a defendant was given an alternative to being in a gang, "[t]he fact that someone chooses to engage in violence is not favorable to someone facing the death penalty." Ultimately, Antonioli concluded that he could not recall what was discussed or done regarding mitigation, but testified that "[i]t would be unlike [Albert] on his death bed to give up trying to save somebody's life."

Counsel's failure to build a more detailed record of Young's troubled past appears firmly grounded in his strategy to argue the death penalty was reserved for the "worst of the worst" offenders, a category in which Young did not belong.

Counsel put forth testimony from Fredrick Smith, an employee of the Oklahoma County Detention Center, who testified that Young had no disciplinary problems while imprisoned. Dr. Murphy testified that Young had no psychiatric problems, was not particularly violent or anti-social, had at least a normal if not above-average intellect, was well-dispositioned, and would not be a danger in a structured prison environment.

When the prosecutor attempted to introduce evidence of Young's violent past, particularly his association with gangs, counsel objected. McZeal, Young's sister, stated that counsel told her to "say something good about Kevin." She testified about Kevin's difficult family situation, including the early deaths of his mother and grandmother, how he was the youngest of 16 children, and how he lived with two of his sisters until he reached age 18. She further testified that despite these troubles, Young was a "no-problem child" who never got into fights and did well in school, even helping other students with their homework. Young attended a "very, very good school," she testified, and was raised in a prominent neighborhood after his grandmother died. She related one story about Young to highlight his good nature – that he always took trash out for an elderly lady near his home and never accepted a fee. With respect to his gang membership, McZeal stated that she suspected Young became involved in a gang later in his life, and that his association with gangs was responsible for his criminal behavior.

All of this evidence was in service of counsel's effort to discredit the

state's "continuing danger to society" aggravator. Had Albert introduced the type of propensity evidence discussed supra, Philip Anderson (one of the prosecutors who tried the case) testified that he would have been prepared to engage in a cross-examination regarding Young's individual participation with gangs and his ability to take himself out of that environment. Because Young was able to live with McZeal in the suburbs, but chose to return to south-central Los Angeles, Anderson testified he would have sought to establish that Young made a conscious decision to remain in a gang and engage in violent activity. Albert's strategy – as Anderson recalled and as evidenced by the record – was to convince the jury that Young is not a violent person.

Based on the evidence presented at the evidentiary hearing, counsel could have relied on the opposite strategy, identifying Young as someone with a propensity to commit acts of violence, but who is less morally culpable for doing so based on his background and circumstances. However, Albert chose to pursue an alternative theory, making exactly the type of strategic decision the Supreme Court and this court have held is not ineffective assistance of counsel.

Furthermore, it appears that Young may have had some impact on counsel's failure, if any, to delve deeper into his family history. See, e.g., Brecheen v. Reynolds, 41 F.3d 1343, 1370 (10th Cir. 1994) ("[T]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.") (quoting Strickland, 466 U.S. at 691).

Floyd testified that when he interviewed Young, Young did not mention any of the serious physical abuse that allegedly occurred when he resided with his Aunt Roberts during his early childhood. Dr. Murphy testified that Albert told him Young chose not to have any family members present during the second stage of the trial.

"As is always the case, trial counsel could have done more." Turrentine, 390 F.3d at 1209. We cannot say, however, that based on the record before us, counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Sallahdin v. Mullin, 380 F.3d 1242, 1247 (10th Cir. 2004) (quoting Strickland, 466 U.S. at 687). Because we do not conclude that counsel's performance fell below an objective standard of reasonableness, we need not decide whether counsel's errors were prejudicial.

## VIII

We **AFFIRM**.